**Opinion issued January 26, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00704-CV

————————————

## IN THE INTEREST OF C.A.J., A CHILD

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2018-00169J

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a jury trial, terminating her parental rights to her minor child,

C.A.J.[2]  In six issues, mother contends that the evidence is legally and factually

---

[1]    *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2]    The trial court also terminated the parental rights of C.A.J.'s alleged father.  He is
       not a party to this appeal.

insufficient to support the jury's finding that termination of her parental rights was in the best interest of C.A.J.,[3] the trial court erred in appointing the Department of Family and Protective Services ("DFPS") as C.A.J.'s sole managing conservator and in excluding certain evidence at trial, her trial counsel provided her with ineffective assistance of counsel, the trial court's judgment does not conform to the verdict, and the case should be remanded to the trial court for a new trial in the interest of justice because of the cumulative effect of the trial court's errors.

We affirm.

## Background

On January 18, 2018, the DFPS filed a petition seeking termination of mother's parental rights to C.A.J. and managing conservatorship of C.A.J.[4]

### *Removal Affidavit*

At trial, the trial court admitted into evidence a copy of the affidavit of DFPS Investigations Supervisor Nisela Zamorano. Zamorano testified that on January 12, 2018, DFPS received a referral alleging negligent supervision of C.A.J. by mother. C.A.J., who was five years old in January 2018, had tested positive for cocaine use on January 8, 2018 after being taken to West Oaks Hospital ("West Oaks")—a

---

[3]  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

[4]  C.A.J. was born in March 2012. He was five years old when he was removed from mother's care in January 2018, and he was seven years old at the time of trial.

2

hospital that provides psychiatric care for children. Mother took C.A.J. to West Oaks after he stated that he wanted to harm himself and mother.[5] According to the referral received by DFPS, on January 10, 2018, C.A.J. was retested for narcotics use. The narcotics-use testing results from January 10, 2018 were negative for cocaine use, which indicated either that there had been a mistake with C.A.J.'s January 8, 2018 testing or that the cocaine that was previously in C.A.J.'s system had "left his system" before the January 10, 2018 retest.

Regarding DFPS's investigation of the allegation of negligent supervision, Zamorano testified that DFPS Investigator Melissa Scott[6] interviewed C.A.J. at West Oaks. C.A.J. appeared clean and healthy. C.A.J. told Scott that he was in the hospital "for saying hateful things to his mother." C.A.J. said that he had an attitude with mother and was mean to her when he had no reason to be. C.A.J. stated that he and mother lived together in a home, there was food in his home, and he received timeouts when he got in trouble. C.A.J. noted that he took medicine at home "for not listening."

Scott also spoke with David Page, a caseworker at West Oaks, who stated that C.A.J. was admitted to the hospital on January 7, 2018. C.A.J. was diagnosed with

---

[5] At the time that Zamorano signed her affidavit on January 18, 2018, C.A.J. was still a patient at West Oaks.

[6] The trial court admitted into evidence a copy of Scott's Child Protective Services ("CPS") Investigation Report. We note that Scott's first name is spelled differently throughout the record.

disruptive mood dysregulation disorder ("DMDD") and attention deficit hyperactivity disorder ("ADHD") and prescribed medication. On January 8, 2018, the day after he was admitted to West Oaks, C.A.J. tested positive for cocaine use by urinalysis. He was retested on January 10, 2018 by urinalysis, and he tested negative for cocaine use. It could not be determined whether the January 8, 2018 positive testing results were a mistake because, by the January 10, 2018 retest, the cocaine that was previously present in C.A.J.'s system could have left C.A.J.'s system.

When Scott interviewed mother, she admitted to being a user of cocaine and explained that after she quit drinking alcohol, she began using cocaine. Mother stated that the last time she had used cocaine was while C.A.J. was being treated at West Oaks in January 2018. Mother denied using cocaine in her home, but she admitted to using cocaine at her friend's house. Mother stated that she did not bring narcotics into the home. Mother did not know how C.A.J. would have ingested cocaine and could not explain why C.A.J. could have tested positive for cocaine use. While speaking to C.A.J.'s babysitter on the telephone in front of Scott, mother told the babysitter that she had "used cocaine in the park one day."[7]

---

[7] Scott's CPS Investigation Report states that when mother visited C.A.J. at West Oaks for a "family session" her behavior was erratic. She "constantly hiccupped and sniffed and wiped her nose with her fingers." Mother was "seemingly unable to remain in a comfortable seated position," her eye contact was erratic, and she "fumbled in her chair." Mother's pupils appeared to be dilated, and she had trouble

4

During her interview with Scott, mother acknowledged that she had a criminal history and a history with DFPS. Mother also told Scott that she had been "arrested because she had fallen asleep behind the wheel [of the car], but [the criminal case against her was] going to be dismissed."[8] On the day of that arrest, mother consumed "one shot" of alcohol at a restaurant.

Regarding C.A.J., mother told Scott that she did not receive child support from C.A.J.'s father. C.A.J. took Adderall, and after being admitted to West Oaks, C.A.J. had also been prescribed Abilify. Mother took C.A.J. to West Oaks after he was "very withdrawn with her" and "made . . . threatening statements." According to mother, she stated that C.A.J. had stated in the past that his "life [was] worthless" and he would throw things. (Internal quotations omitted.)

Zamorano's affidavit also detailed mother's history with DFPS. In fall 2012, when C.A.J. was an infant, he was removed from mother's care after she was found highly intoxicated while caring for the child. Mother admitted that she could not recall the details of that evening.[9] About a month later, mother was transported to

---

answering questions. The therapist in the family session believed that mother was "under the influence of a substance[]." C.A.J. moved seats and seemed uncomfortable sitting next to mother. As Scott explained in her report, because of mother's "erratic behavior[] [and C.A.J.'s] possible cocaine trace," "there [was] concern of substance abuse in [mother's] situation and [there was a] consequential a concern for [C.A.J.'s] well[-]being."

[8]  The date of this arrest is unclear.

[9]  Scott's CPS Investigation Report states that, in October 2012, mother was found unresponsive after consuming a large quantity of alcohol. C.A.J. was present at the

the hospital for "a possible overdose and alcohol abuse." Mother told the nurse that she had taken "two pills," and she tested positive for barbiturates use. C.A.J. was then placed in foster care, but he was returned to mother's care at some point.[10]

In January 2013, mother was found unconscious while caring for C.A.J. as the result of either drinking alcohol or using pills.[11] Mother admitted to consuming alcohol and to "passing out." Testing results showed that mother was positive for alcohol use. C.A.J. was again removed from mother's care. After mother completed certain requirements dictated by DFPS, C.A.J. was returned to her care.[12]

---

time. Another adult was also present, but he or she was not completely sober and was not comfortable caring for C.A.J. Concerns were raised about mother's ability to safely care for C.A.J. due to her level of alcohol consumption. Mother admitted to not being able to recall the details of that evening.

[10] Scott's CPS Investigation Report states that, in November 2012, a subsequent report was made that mother was unable to provide appropriate care for C.A.J. as she had possibly overdosed, was in the hospital, and had no one to care for C.A.J. Mother told the nurse at the hospital that she had taken "two pills." Narcotics-use testing results showed that mother was positive for barbiturates use, and C.A.J. was placed into foster care. The suit against mother was dismissed in December 2012 because of a "no show" by the local CPS agency.

[11] Scott's CPS Investigation report states that, on January 30, 2013, mother placed C.A.J. at risk of harm because she was found unconscious for a third time while caring for C.A.J. Mother admitted to consuming alcohol and remembered "passing out." C.A.J. was again removed from mother's care. The report notes that mother refused to accept that she had a problem with or an addiction to alcohol and she denied needing inpatient treatment services. Mother insisted that she was having a negative reaction to her medications which caused her to "black out[]" and "pass[] out." (Internal quotations omitted.) Mother purportedly hid liquor bottles in the freezer, the cabinets, the restroom, and luggage areas in her home.

[12] Scott's CPS Investigation Report states that C.A.J. was returned to mother's care after she completed "court ordered services" and "remained sober."

In 2016, C.A.J. was removed from mother's care for a third time when a law enforcement officer found mother "intoxicated and incoherent at a red light with [C.A.J.] in the car." C.A.J. handed the law enforcement officer "a bottle of [liquor] and stated that it was . . . mother's [bottle]." Mother admitted to consuming alcohol that day. After mother completed certain requirements dictated by DFPS, C.A.J. was returned to her care.

### Dr. Uzokwe

Dr. Festus Uzokwe, a psychiatrist who treated C.A.J. at West Oaks, testified that C.A.J. was admitted to West Oaks on January 7, 2018 because "he was feeling like killing himself" and had been "hearing voices telling him to hurt himself" and mother.[13] He was angry and agitated. C.A.J. was supposed to be taking Adderall regularly while in mother's care because he had been previously diagnosed with ADHD. Dr. Uzokwe also diagnosed C.A.J. with DMDD and prescribed Abilify, a psychotropic drug, to address C.A.J.'s hallucinations. Dr. Uzokwe noted that he had difficulty reaching mother to discuss C.A.J.'s condition or treatment while C.A.J. was a patient at West Oaks, but he did speak to her on one occasion. When he did

---

[13] The trial court admitted into evidence a copy of C.A.J.'s records from West Oaks. The notes in the records state that C.A.J. threatened to kill mother and himself with a knife by cutting his own throat because of auditory hallucinations. C.A.J. was exhibiting physical aggression at home and school. C.A.J. reportedly would "rage[] with minimal provocation," yell, and break things. His aggression purportedly started about six to eight weeks before January 7, 2018. Mother was also concerned about C.A.J. lying.

7

so, mother reported to Dr. Uzokwe that C.A.J. had been experiencing "moodability," aggression, and difficulty sleeping, and he had been hearing voices. Mother consented to C.A.J. being given Adderall and Abilify, although she expressed concern about the potential for addictiveness.

Dr. Uzokwe also explained that on January 8, 2018, C.A.J. was tested for narcotics use. The urinalysis testing results[14] showed that C.A.J. was positive for cocaine use, and they did not show that C.A.J. had been taking his Adderall while in mother's care.[15] Because cocaine usually only stays in a person's urine for two to three days, the January 8, 2018 positive testing results indicated that C.A.J. would have ingested cocaine within forty-eight to seventy-two hours before being brought to West Oaks. In other words, C.A.J. would have ingested cocaine while in mother's care. Dr. Uzokwe explained that the ingestion of cocaine by a child is worrisome because it could cause increased agitation, irritability, hallucinations, paranoia, respiration difficulty, sleeping difficulty, and an increase in heart rate, which could lead to a heart attack or a stroke.

Because of the January 8, 2018 positive testing results, C.A.J. was retested for narcotics use on January 10, 2018. The urinalysis testing results from January 10,

---

[14]     The trial court admitted into evidence a copy of the January 8, 2018 narcotics-use testing results for C.A.J.

[15]     According to Dr. Uzokwe, the January 8, 2018 narcotics-use testing results should have shown that C.A.J. was taking Adderall unless he was not being given it regularly while in mother's care.

8

2018 showed that C.A.J. was negative for cocaine use, but that he was taking his Adderall—which the hospital staff had been giving him since his arrival on January 7, 2018. Dr. Uzokwe noted that these testing results could mean that the cocaine that was previously in C.A.J.'s system had "passed" or "gone out" or it was possible that there was a mistake with the January 8, 2018 positive testing results.

Dr. Uzokwe also testified that, while at West Oaks, C.A.J. participated in group activities and counseling sessions with the goal of establishing "coping strategies or anger management skills appropriate for [C.A.J.'s] age and problem[-]solving skills." C.A.J. was discharged from West Oaks at the end of January. At the time that he was discharged, C.A.J. was not experiencing hallucinations or suicidal or homicidal thoughts. C.A.J. was instructed to continue taking Adderall and Abilify after leaving West Oaks.[16]

According to Dr. Uzokwe, C.A.J., while being treated at West Oaks, was cooperative and smart, but he had episodes of behavioral challenges. C.A.J., during his counseling or therapy sessions, identified mother as a coping resource, and he appeared to be bonded with her. C.A.J. stated that he relied on mother for support

---

[16] C.A.J.'s records from West Oaks state that he was discharged on January 31, 2018. At the time of discharge, C.A.J. had goal-oriented and logical thought processes, did not show signs of delusion or paranoia, was not experiencing hallucinations, and did not have suicidal or homicidal thoughts.

and "felt he could go to her." Dr. Uzokwe did not have any concerns about C.A.J. not being fed while in mother's care or about his physical appearance.

### *Bruce Jeffries*

Bruce Jeffries, who works for the National Screening Center and National Assessment Center, testified as an expert on narcotics-use testing. Regarding C.A.J.'s narcotics-use testing, Jeffries explained that C.A.J. was tested for narcotics use for a third time on January 22, 2018. The hair follicle testing results[17] showed that C.A.J. was positive for cocaine use, specifically that C.A.J. had ingested cocaine sometime within the ninety days before the January 22, 2018 test. The results indicated that C.A.J.'s level of usage of cocaine was "[a] lot" and that C.A.J. was using cocaine "almost daily" during the previous ninety days. Jeffries stated that C.A.J. was a "chronic user" of cocaine. And Jeffries had "no doubt" that C.A.J. had ingested "high levels of cocaine." Jeffries opined that a five-year-old ingesting cocaine was dangerous and that a child could be given cocaine daily without being aware of it.

Jeffries also stated, about C.A.J.'s January 8, 2018 narcotics-use testing results, that the urinalysis results did not show that C.A.J. had any Adderall in his system, but it showed that he was positive for cocaine use. However, Jeffries could

---

[17] The trial court admitted into evidence a copy of the January 22, 2018 narcotics-use testing results for C.A.J.

not determine from the January 8, 2018 testing results whether C.A.J. had been taking his Adderall as prescribed. The positive testing results for cocaine use indicated that C.A.J. had ingested cocaine one to three days before January 8, 2018. And if C.A.J. had ingested cocaine before he was admitted to West Oaks on January 7, 2018, it may have left his system by the January 10, 2018 retest. Although Jeffries generally questioned the validity of the January 8, 2018 and January 10, 2018 narcotics-use testing that occurred at West Oaks, he was confident that the narcotics-use testing performed by his company on January 22, 2018, which showed that C.A.J. had ingested cocaine, was reliable. Jeffries stated that he was "100 percent" confident that C.A.J. had ingested "[a] lot" of cocaine sometime within ninety days before the January 22, 2018 narcotics-use testing and no combination of medications would have caused the January 22, 2018 positive testing results that revealed cocaine use.

Regarding mother's narcotics-use testing, Jeffries testified that mother was tested for narcotics use on January 18, 2018.[18] The hair follicle testing results showed that mother was positive for cocaine use, specifically that mother had ingested cocaine sometime within the ninety days before the test—likely when C.A.J. was in her care. As with C.A.J., the results indicated that mother was using

---

[18] The trial court admitted into evidence a copy of the January 18, 2018 testing results for mother.

11

cocaine on a daily or "nearly daily" basis within the ninety days before the January 18, 2018 test. Jeffries described mother's cocaine usage as "heavy." The urinalysis testing results from January 18, 2018 showed that mother was positive for cocaine use and prescription Xanax use.[19] Based on these results, Jeffries explained that mother would have used cocaine within the three days before the test. The level of cocaine in mother's urine was "pretty high," indicating that mother would have "used an extensive amount of cocaine" sometime within the seventy-two hours before the January 18, 2018 test.

Jeffries testified that mother was tested again for narcotics use on March 8, 2018.[20] The hair follicle testing results showed that mother was positive for cocaine use, specifically that mother had ingested cocaine sometime within the ninety days before the test. The urinalysis testing results showed that mother had not used cocaine within the seventy-two hours before the March 8, 2018 test.

Mother was next tested for narcotics use on May 24, 2018.[21] The hair follicle testing results showed that mother was positive for cocaine use, specifically that

---

[19]  Jeffries noted that Xanax usually stays in a person's urine for one to three days, but it could stay in a person's urine for up to fourteen days. Cocaine stays in a person's urine for up to three days.

[20]  The trial court admitted into evidence a copy of the March 8, 2018 testing results for mother. C.A.J. had not been in mother's care since January 2018.

[21]  The trial court admitted into evidence a copy of the May 24, 2018 testing results for mother.

mother had ingested cocaine within the ninety days before the test.[22] According to Jeffries, this would indicate that mother had used cocaine sometime between her first January 18, 2018 narcotics-use test and her May 24, 2018 narcotics-use test and after C.A.J. had been removed from her care. The urinalysis testing results showed that mother had not used cocaine within seventy-two hours of the May 24, 2018 test.

Mother was again tested for narcotics use on June 14, 2018.[23] The urinalysis testing results showed that mother was positive for barbiturates and codeine use.

Mother was then tested for narcotics use on October 3, 2018, November 30, 2018, and February 6, 2019.[24] Mother's October 3, 2018 urinalysis testing results showed that mother was positive for prescription Valium and Vicodin use. And mother's November 30, 2018 urinalysis testing results showed that mother was positive for prescription Vicodin use. Further, mother's February 6, 2019 urinalysis testing results showed that mother was positive for prescription Xanax, Valium, and Vicodin use. Jeffries noted that mother would need prescriptions for the positive testing results for such narcotics to not be concerning. Yet, the results for mother's

---

[22] Ninety days before May 24, 2018 is February 24, 2018. *See Higginbotham v. Gen. Life & Accident Ins., Co.*, 796 S.W.2d 695, 696 (Tex. 1990) (court may take judicial notice of dates).

[23] The trial court admitted into evidence a copy of the June 14, 2018 testing results for mother.

[24] The trial court admitted into evidence copies of the October 3, 2018, November 30, 2018, and February 6, 2019 testing results for mother.

narcotics-use testing on June 14, 2018, October 3, 2018, November 30, 2018, and February 6, 2019, copies of which the trial court admitted into evidence, stated that mother's testing results were considered "positive [for prescription narcotics use] until further verification of prescriptions."

On May 30, 2019 mother tested negative for narcotics use.[25]

### DFPS Investigations Supervisor Zamorano

DFPS Investigations Supervisor Zamorano testified that on January 12, 2018, DFPS received a report alleging negligent supervision of C.A.J. by mother after C.A.J. tested positive for cocaine use while being treated at West Oaks. The report also alleged that mother had arrived at West Oaks acting erratically and nervously. After DFPS received the report, mother consented to having C.A.J. tested for narcotics use by DFPS. Mother also participated in an interview with a DFPS investigator. During her interview with the investigator, mother admitted to using cocaine, but stated that she had never used narcotics around C.A.J. Therapists from West Oaks also told the DFPS investigator that C.A.J. was angry and upset by mother. During his interview with the DFPS investigator, C.A.J. denied being left alone while in mother's care, denied seeing any narcotics, and denied seeing mother

---

[25] The trial court admitted into evidence a copy of the May 30, 2019 testing results for mother. The trial court also admitted into evidence a copy of the testing results from June 27, 2019, which were negative for narcotics use.

14

using narcotics or consuming alcohol. At the completion of DFPS's investigation, it was determined that there had been neglectful supervision of C.A.J. by mother.

Regarding mother's history with DFPS, Zamorano explained that C.A.J. was removed from mother's care and placed in a foster home in November 2012 when C.A.J. was an infant because allegedly mother had been highly intoxicated while caring for C.A.J. It was also reported to DFPS that mother had potentially overdosed. Mother admitted to being intoxicated and "taking some pills" while C.A.J. was in her care. C.A.J. was later transitioned back into mother's care in January 2013, but within about two weeks of C.A.J. being returned to mother's care, he was removed again due to concerns with mother's continued narcotics use and alcohol abuse. C.A.J. was returned to mother's care in October 2013. According to Zamorano, C.A.J. was later removed from mother's care in June 2016 after a "traffic incident" involving mother. Mother was found intoxicated, incoherent, and unresponsive at a red light with C.A.J. in the car with her. When a law enforcement officer arrived at the scene, C.A.J. handed him a bottle of liquor. C.A.J. was later returned to mother's care in November 2016 after mother "worked services [dictated by DFPS] . . . and regained sobriety."

In Zamorano's opinion, it was not safe for C.A.J. to be returned to mother's care after he was discharged from West Oaks at the end of January 2018 because of mother's narcotics use. And although C.A.J. was bonded with mother, Zamorano

stated that she had "grave concern" about the fact that C.A.J. had tested positive for cocaine use given that mother had a history of substance abuse. And although mother had participated in substance-abuse treatment in the past, she tended to revert to the same behavior. Because of C.A.J.'s previous removals from mother's care and the level of cocaine found in his system, in Zamorano's opinion, it was crucial that C.A.J. remain in a safe and stable home for the rest of his childhood.

Zamorano further noted that after being discharged from West Oaks, DFPS placed C.A.J. in a "therapeutic foster home."[26] It was important for C.A.J. to be placed in a therapeutic foster home because he had been diagnosed with ADHD and DMDD, he had tested positive for cocaine use, and he had expressed suicidal and homicidal thoughts.

### *Sergeant Collier*

Corpus Christi Police Department ("CCPD") Sergeant J. Collier testified that on June 27, 2016,[27] around 6:22 p.m., she was dispatched in response to a call about mother being "passed out behind the wheel" of a car that was stopped in the left-hand lane of a major roadway. When Collier arrived at the scene, which was a busy intersection, she saw mother "passed out" in the driver's seat of her car, "slumped

---

[26]    Zamorano described a "therapeutic foster home" as a "foster home that caters more to children with more needs in terms of having more hands-on care."

[27]    The trial court took judicial notice that June 27, 2016 was a Monday.

16

over," and unconscious. Collier could smell "the intoxicating beverage emanating" from mother. Mother's car was in the middle of the street. Emergency medical technicians ("EMTs") were attending to mother, and they administered Narcan because it was unclear why mother was unconscious.[28] Because Narcan did not have any effect on mother, the EMTs did not believe narcotics use to be the reason for mother's unresponsiveness. Mother did regain consciousness before leaving the scene, but Collier noted that mother continued to be "[i]n and out" of consciousness until she arrived at the hospital. The EMTs transported mother to the hospital by ambulance.

While searching mother's car, Collier found a partially empty liquor bottle, and the EMTs gave her an empty prescription bottle for hydrocodone with mother's name on it, which they had found in mother's lap. Collier believed that mother was intoxicated, and she explained at trial that it was unusual to find someone driving while intoxicated with a child in the car. At the hospital, mother was uncooperative with the medical staff, her speech was slurred, and her eyes were red and glassy. Collier stated that mother was "obviously intoxicated" but not unconscious at the hospital. Collier did not have mother perform any field sobriety tests at the hospital because Collier felt that "due to her intoxicated state she could hurt herself if she

---

[28] Narcan is an antidote to opioid overdose. *See Bowen v. State*, No. 02-19-00255-CR, 2020 WL 1949021, at *2 n.5 (Tex. App.—Fort Worth Apr. 23, 2020, pet. ref'd) (mem. op. not designated for publication).

17

tried walking." Collier obtained a search warrant so that mother's blood could be drawn.

Regarding C.A.J., Sergeant Collier stated that he was found unbuckled in the back seat of mother's car by the first law enforcement officer that arrived at the scene. C.A.J. handed that first arriving officer the liquor bottle that Collier later recovered from mother's car. No one else was in the car other than mother and C.A.J. In Collier's opinion, C.A.J. was in danger while inside the car with an unconscious mother because mother's car was parked in the middle of the street, so it could have been hit by another car. C.A.J. was also four years old at the time, and he could have "run off" or been "hit by a car." At the scene, C.A.J. was upset and worried about mother. And he was worried "about where he was going to be going" and "[w]ho was going to be taking care of him." C.A.J. did not appear to be physically harmed and appeared healthy to Collier.[29]

---

[29] The trial court admitted into evidence a copy of the CCPD "Incident/Investigation Report" from the June 27, 2016 incident involving mother. The first arriving law enforcement officer stated the following in the report:

> I . . . was patrolling the area . . . , when I observed several vehicles at a stop on the 5100 block of Weber NB and several citizens assisting a female inside a small passenger car, slumped over her steering wheel. The female was unresponsive.

> An unknown citizen advised that the vehicle was off and she witnessed the female appear[ing] to be asleep inside her car, on the roadway; therefore, she pulled over to assist. . . . [T]here was heavy traffic during th[at] time. I witnessed a child in the back of the vehicle, out of his child safety seat, and I witnessed a 2/3 full liquor bottle on the front passenger seat, next to a large purse. The child grabbed the

### DFPS Caseworker Owens

DFPS caseworker LaQuesha Owens testified that C.A.J. entered DFPS's care after he and mother tested positive for cocaine use in January 2018. After C.A.J. entered DFPS's care, he was discharged from West Oaks at the end of January 2018 and placed in a foster home from January 2018 to May 2018. In May 2018, C.A.J. was admitted to IntraCare North Hospital ("IntraCare North")—a psychiatric hospital—for about a month.[30] C.A.J. was then placed in another foster home from June 1, 2018 until July 6, 2018, while DFPS waited for the results of a home study for a foster to adopt placement in Corpus Christi, Texas. The potential foster to adopt placement was with a family that C.A.J. had previously known and stayed with. C.A.J. stayed with the foster family in Corpus Christi from July 2018 until November 2018.[31] Ultimately though, C.A.J.'s Corpus Christi foster family could

---

liquor bottle and handed it to me and stated, "this is my mommy's drink." . . . I placed the liquor bottle on the floor board behind the driver[']s seat and advised assisting officers of my finding. I then grabbed the child and placed him in my patrol [car] while [the EMTs] attended to his mother, who remained unresponsive.

The report contains additional information about the June 27, 2016 incident, and states that mother was "arrested for suspicion of driving while intoxicat[ed] with a child."

[30] At IntraCare North, C.A.J. was again diagnosed with ADHD and DMDD.

[31] C.A.J.'s Corpus Christi foster mother, Alda Hernandez, testified that she met mother in 2013 when mother was a resident at an inpatient substance abuse rehabilitation center and Hernandez was the female program manager. They maintained contact after mother left the rehabilitation center, and when C.A.J. was reunited with mother sometime after July 2013, Hernandez would babysit him while mother worked. C.A.J. was about two years old at the time, and he and mother both lived in Corpus

not continue caring for him because of an emergency health situation with another member of the foster family.[32] DFPS then sought to find C.A.J. another "forever home." In November 2018, C.A.J. was placed in a foster home with a new adoptive foster family, which DFPS thought would be a good fit for him. After about two weeks though, the foster mother reported that she could not handle C.A.J.'s misbehavior and asked that C.A.J. be removed from the home. Thus, C.A.J. was moved to another adoptive foster family on November 20, 2018. C.A.J. was still in that foster placement at the time of trial.[33]

---

Christi. Hernandez was also called to pick up C.A.J. at the scene on June 27, 2016 when mother was found unconscious in the driver's seat of her car with C.A.J. in the back seat. DFPS temporarily placed C.A.J. in Hernandez's home for about two months after the June 27, 2016 incident.

[32] Hernandez testified that when C.A.J. was placed with her family in July 2018, she and her husband planned to adopt him. However, Hernandez's daughter-in-law had a stroke and became disabled, which required certain additional family members to move into Hernandez's home, and she and her family were not going to be able to give C.A.J. the support that he needed. Hernandez stated that, while in her care in 2018, C.A.J. took medications to help with listening, sleeping, and waking up in the morning. C.A.J. had been diagnosed with oppositional defiant disorder ("ODD"), ADHD, and depressive mood disorder, and he saw a therapist while in Hernandez's care. When C.A.J. came to live with her family in July 2018, he would throw tantrums when things did not go his way, he would hit himself, he would scratch himself, and he would say things like no one loved him, he wanted to go to back to the hospital, he wanted to hurt mother, he did not want to see mother, and he wanted to hurt himself. According to Hernandez, C.A.J. would, "[a]t times," report that he missed mother. After C.A.J. would have visits with mother, he would "come back very aggressive" and would "act[] out" for a couple of days, which was different than his normal behavior.

[33] C.A.J. met his current foster parents before he was placed with them.

Regarding C.A.J.'s current adoptive foster placement, when C.A.J. was placed with his current foster family, there was a foster mother, a foster father, and a thirteen-year-old foster child in the home.[34] Prior to placing C.A.J. with his current foster family, Owens spoke with the foster parents about his history of misbehavior, acting out, being defiant, cursing, lying about certain situations, and taking things that did not belong to him. The first couple of months in C.A.J.'s current placement were "rough" because of C.A.J.'s misbehavior and because the thirteen-year-old foster child in the home admitted to engaging in inappropriate sexual touching with C.A.J.[35] The inappropriate sexual touching incident occurred in November or December 2018, and upon learning of its occurrence, C.A.J.'s foster parents immediately separated the thirteen-year-old foster child and C.A.J. And C.A.J. and his foster mother left the home until the thirteen-year-old foster child was removed from the home and placed elsewhere. The foster parents also immediately reported the incident to the appropriate agencies, and C.A.J.'s foster mother took C.A.J. to therapy to help him deal with the situation. C.A.J. continued to see a therapist

---

[34] The thirteen-year-old foster child may have been placed in the foster home shortly after C.A.J. was placed in the home.

[35] The thirteen-year-old foster child admitted to being the instigator of the inappropriate sexual touching. Owens noted that the thirteen-year-old foster child had previously been a victim of sexual abuse and neither DFPS nor the C.A.J.'s foster parents were aware of the child's sexual-abuse history when C.A.J. was placed in the foster home. DFPS's investigation revealed that the inappropriate sexual touching incident was not a "one-time thing," but had occurred over a period of a few weeks.

throughout the pendency of the termination case, and his current foster parents take him to his therapy appointments.[36] According to Owens, C.A.J.'s current therapist did not believe that C.A.J. would have long-lasting effects from the inappropriate sexual touching incident with the thirteen-year-old foster child.

Owens further testified that C.A.J.'s behavior improved in the beginning of 2019 and he was doing better in his current foster home.[37] C.A.J. had a very good relationship with his foster parents and there appeared to be a bond between them. C.A.J.'s foster parents told Owens that they wanted to see C.A.J. in a permanent, stable, and safe placement and they wanted to adopt him. C.A.J.'s foster parents are committed to him. Owens believed that the best placement for C.A.J. was his current foster placement because his foster parents keep him safe and provide him with stability and permanency with his schooling and in the home. C.A.J.'s foster parents have not put him in any danger. Owens noted that she had observed the foster parents' parental abilities and she did not have concerns.[38] For instance, when C.A.J.

---

[36]    Owens testified that she was comfortable with the steps that C.A.J.'s current foster parents took to address the inappropriate sexual touching incident after they learned about it.

[37]    The only people living in C.A.J.'s current placement at the time of trial were him, his foster mother, and his foster father.

[38]    Child Advocates, Inc. volunteer Joy Franklin testified that she had observed C.A.J. in his current foster placement. C.A.J. appeared happy, seemed to be a part of the community, and "look[ed] like he[] [was] in a home-like environment." She believed that C.A.J. should remain with his current foster placement, which had structured, loving, and nurturing caregivers, who provided C.A.J. with a solid foundation.

was "acting out," his foster parents would tell him that there were consequences for his actions, such as having his iPad taken away or an outing canceled due to his misbehavior.

Owens did note that mother had suggested other possible placements for C.A.J., including with her girlfriend, Amber. Although DFPS looked into Amber as a possible placement for C.A.J., Owens stated that DFPS did not feel that Amber would be protective of C.A.J. or be able to keep him safe. And Owens explained that Amber had not seemed to take an interest in C.A.J. during the pendency of the termination case. According to Owens, DFPS also looked into placing C.A.J. with his maternal grandparents, but they declined to take him, stating that they would not be able to care for him due to their age and the fact that C.A.J.'s older sister was already living in their home. C.A.J.'s maternal grandmother also told Owens that if C.A.J. were to come live with her, she wanted to be able to give him back to mother without DFPS's involvement.

Regarding mother's substance-abuse issues, Owens testified that mother attended the Nexus Recovery rehabilitation facility ("Nexus Recovery") in Dallas, Texas around March 2018 after C.A.J. was removed from her care. And at some point, in spring 2018, mother was successfully discharged from that rehabilitation facility. Mother then "relapsed" "with pills" and entered the Cenikor rehabilitation

facility ("Cenikor") in Deer Park, Texas.[39] In May 2018, mother was unsuccessfully discharged from Cenikor because she had twice tested positive for opiates and benzodiazepines use. Next, mother entered a ninety-day outpatient treatment program at Billy T. Cattan Recovery Outreach Center ("Billy T. Cattan Recovery") in Victoria, Texas. Mother began that program in June 2018, and she was unsuccessfully discharged in January 2019 for "excessive absences" and not complying with treatment."[40] In February 2019, mother entered the La Hacienda Treatment Center ("La Hacienda") in Kerrville, Texas and she successfully completed a thirty-day treatment program. The goal after mother completed the program at La Hacienda was for her to "maintain her sobriety" and to become

---

[39]  The trial court admitted into evidence a copy of the "Discharge Summary" from Cenikor, which states that mother began treatment at the rehabilitation facility on May 1, 2018 and she was discharged on May 25, 2018. The "Final Assessment" in the report states that mother "did not appear motivated to change the behavior[] and attitude[] that contributed to her addiction. She was at a high risk of relapse at discharge." It also notes that mother "d[id] not have a supportive family situation" at the time.

[40]  The trial court admitted into evidence copies of several "Monthly Progress Report[s] and Treatment Team Meeting Record[s]" from Billy T. Cattan Recovery, which state that mother entered treatment on June 11, 2018. The June 30, 2018 progress report states that her participation was "[p]oor" and she missed group and individual appointments. The July 31, 2018 progress report states that mother's participation was "[p]oor" and her progress was "[p]oor." Mother did not attend any appointments in July. The August 31, 2018 progress report states that mother's participation was "[p]oor" and her progress was "[p]oor." Mother missed five appointments in August. The September 30, 2018 progress report states that mother's participation was "[p]oor" and her progress was "[p]oor." Mother "made no progress th[at] month in [the] program" and had excessive absences. The October 31, 2018 progress report states that mother's participation was "[p]oor," her progress was "[p]oor," and mother did not attend any appointments in October.

involved with an Alcoholics Anonymous program. Mother then entered a long-term treatment program at Omega Recovery in Austin, Texas. In May 2019, shortly before trial, mother was tested for narcotics use and that was the first test where mother was negative for illegal and prescription narcotics use since the termination case had begun.[41]

Regarding mother's Family Services Plan ("FSP"), Owens explained that mother was required to submit to a psychosocial evaluation, a substance-abuse assessment, and random narcotics-use testing. Mother was also required to maintain stable employment and stable housing, sign a "release of information form," stay in contact with the DFPS caseworker, and attend family-therapy sessions. Mother's counsel went over her FSP with her at a status hearing, and there was no indication that mother was confused by its requirements. Owens noted that mother completed the required parenting classes at one of the substance-abuse treatment programs that she attended, and mother maintained contact with Owens through her attorney. Mother missed two court hearings during the pendency of the case, and Owens did not receive monthly proof that mother had stable employment.[42] Owens stated that proof of a stable income was necessary to show that mother could provide for C.A.J.

---

[41]    According to Owens, mother did not have prescriptions for certain prescription narcotics that she tested positive for during the termination case. In other words, mother's "prescription list that she gave [Owens] and the results[] [from her narcotics-use testing] didn't match."

[42]    Owens noted that mother had been having problems with her nursing license.

25

if he was returned to her care.[43] Mother did not participate in family-therapy sessions because C.A.J.'s therapist never recommended that mother and C.A.J. attend family-therapy sessions.[44] As to mother's ability to maintain safe and stable housing, Owens testified that mother provided her with a leasing agreement in October 2018. However, Owens also explained that when DFPS became involved with C.A.J. in early 2018, mother was living in Houston, Texas, but in June 2018, Owens was told that mother was living in Victoria with her girlfriend, Amber. Owens then learned that mother had moved again, and at some point, during this case, mother lived in Waco, Texas.

Regarding mother's visits with C.A.J., Owens testified that mother had a visit scheduled in February 2018. On the day of the visit, C.A.J. was brought to the visit location, but mother did not timely arrive. When Owens called mother, mother told Owens that she was about fifteen minutes away, but she showed up two hours later. According to Owens, C.A.J. knew he was supposed to have a visit with mother that day and he was expecting to see her, but mother was so late that C.A.J. left before she arrived. Mother had a visit with C.A.J. in March 2018, but she cancelled her visit with C.A.J. in April 2018. Mother then saw C.A.J. in May 2018, but Owens

---

[43]     Owens stated that mother gave C.A.J. clothes and gifts while he was in DFPS's care.

[44]     C.A.J.'s therapist believed that participating in family-therapy sessions with mother would increase C.A.J.'s misbehavior.

was not present at that visit. Owens did observe mother's visit with C.A.J. in June 2018, which Owens described as "fine." Owens noted that mother's interaction with C.A.J. was appropriate and C.A.J. appeared bonded with mother. C.A.J. was excited to see mother that day, and it was clear to Owens that mother and C.A.J. loved each other. After the June 2018 visit, mother expressed concern that C.A.J. looked sick,[45] "his toenails were too long," she did not like his haircut, and his feet smelled. Owens, who was present at the visit, did not share those same concerns about C.A.J.

Mother next attended visits with C.A.J. on August 9, 2018, August 16, 2018, August 22, 2018. But in September 2018, the trial court stopped mother's visits with C.A.J. because there was concern about C.A.J.'s misbehavior before and after his visits with mother. Mother did attend a "Christmas visit" with C.A.J. in December 2018, and C.A.J. seemed to have a good time with mother. Mother's girlfriend, Amber, also attended that visit, and Owens stated that it did not appear that C.A.J. had a bond with Amber. Visits with mother and C.A.J. remained suspended until April 2019, when C.A.J.'s therapist recommended that visits be resumed. Mother's visits with C.A.J. in April and May 2019 went well. Owens expressed concern though that whenever C.A.J. would bring up something about his foster mother

---

[45]    Owens stated that she informed C.A.J.'s foster mother at the time of the sick "allegations" and the foster mother took C.A.J. to see a doctor who determined that C.A.J. was fine. Owens also mentioned mother's hygiene concerns for C.A.J., and the foster mother took steps to address those concerns.

during a visit, for instance by saying, "Well, my mom," mother would correct him and tell him to use the term "foster mom" instead of "mom." (Internal quotations omitted.) This caused C.A.J. to be "taken aback." Owens noted that C.A.J. said "good things about [his] foster parents" during his visits with mother.

Regarding the suspension of mother's visits with C.A.J. during the pendency of the termination case, Owens stated that while C.A.J. was at West Oaks, his contact with mother was cut off during the latter part of his stay, and after that occurred, C.A.J. started telling his therapist that he was angry with mother and began talking about wanting to die and wanting to kill mother. But C.A.J. also missed mother while at West Oaks, and according to Owens, being cut off from mother during his stay at West Oaks could have impacted C.A.J.'s misbehavior during that time.

After C.A.J. was discharged from West Oaks and placed in a foster home, C.A.J. saw mother in March 2018 for a visit. Following that visit with mother, C.A.J.'s misbehavior escalated. He started acting disrespectfully and aggressively at school and at home, using profanity, and "taking things that didn't belong to him." According to Owens, this misbehavior by C.A.J. was more than "the typical . . . limit-testing behavior[]" that children normally exhibit. C.A.J.'s behavior was centered around having contact with mother.[46]

---

[46]     Owens explained that when C.A.J. did not have contact with mother during the termination case, he would "do normal five-year-old things."

28

Owens also testified that beginning in April 2018, after C.A.J. would have a telephone call with mother, he acted out more, was more disrespectful to his foster family, "started taking things that didn't belong to him," started lying more, and began misbehaving in school. This trend of misbehavior continued to escalate after a visit with mother. C.A.J. also started using "racial slurs" directed at his foster family and his teacher. C.A.J.'s misbehavior prompted him to be taken to a psychiatric hospital in May 2018, where he stayed about a month for treatment.[47]

Although his misbehavior subsided for a bit after he was discharged from the psychiatric hospital, it eventually returned and was again exhibited after C.A.J.'s visits with mother. For instance, C.A.J. would have "meltdowns that [would] last over an hour" and he would threaten himself and mother. C.A.J. also started acting out before his visits with mother. C.A.J. would say to his foster family such things as "why do I have to go to these stupid visits" or "I told you . . . I didn't want to see her." C.A.J would also hit his head on the wall. Then, after his visits with mother, C.A.J. would have "total meltdowns" and "literally tear up his bedroom." Such misbehavior was concerning, and his visits with mother were stopped based on his therapist's recommendation. When C.A.J. was told that his visits with mother would be stopped, he was "okay" with it.

---

[47] According to Owens, C.A.J. was admitted to the psychiatric hospital because of his erratic behavior. He had made threats toward his foster parents, had threatened to harm himself, other kids at school, and his teacher, and was using racial slurs.

According to Owens, after C.A.J.'s visits with mother were suspended, C.A.J. "settle[d] down" and she would not receive as many reports of C.A.J. exhibiting aggressive behavior. However, after C.A.J.'s "Christmas visit" with mother, in December 2018, C.A.J. tore up everything that mother brought him. Further, when visits with mother resumed in April 2019, C.A.J.'s misbehavior started again both before and after his visits with mother.

During her testimony, Owens expressed concern about mother's parental abilities due to mother's "multiple rehab[] [stays] and . . . relapses" because such difficulties did not indicate the stability that C.A.J. needed. Owens stated that mother's narcotics use, and alcohol use had placed C.A.J. in danger, and the fact that C.A.J. ingested cocaine while in mother's care was particularly dangerous. This termination case was the fourth time that DFPS had to remove C.A.J. from mother's care. C.A.J. needed a safe and stable environment where his medical needs could be taken care of. Owens noted that C.A.J. had been participating in therapy since he came into DFPS's care, particularly to address his emotions and misbehavior, including his meltdowns. C.A.J. had received psychiatric treatment in every placement he had been in while in DFPS's care. And C.A.J. had several psychological evaluations completed while in DFPS's care. At the time of trial, C.A.J. took certain medications for ADHD.

According to Owens, mother's parental rights to C.A.J. should be terminated because C.A.J. needed permanency and a safe, stable, narcotics-free environment where he could be taken care of, not harmed, and where he could grow, be happy, and prosper. C.A.J. should not be in a home where he feels like there is a possibility that he will be removed and placed in DFPS's care again.

### C.A.J.'s Foster Mother

C.A.J.'s current foster mother testified that she, C.A.J., and her husband, C.A.J.'s foster father, lived together in a home. C.A.J. started living with his current foster family during the last week in November 2018, when he was six years old. At the time of trial, C.A.J. had been living with his foster family for about eight months. C.A.J.'s foster mother was told that C.A.J. had been struggling with his misbehavior in his previous foster home and that he had threatened another child in the home. After C.A.J. was placed in her home, another foster child, a thirteen-year-old, was also placed in the home as well. C.A.J.'s foster mother was told that the thirteen-year-old foster child had "a failed adoption," his adoptive parents had "put him back into foster care in January of 2018," and he had been in a group home. C.A.J's foster mother was not told that the thirteen-year-old foster child had been sexually abused in the past.

Regarding the inappropriate sexual touching incident between C.A.J. and the thirteen-year-old foster child, C.A.J.'s foster mother explained that on the evening

of December 25, 2018, the thirteen-year-old foster child told her and her husband that he had engaged in inappropriate sexual touching with C.A.J. and that "he didn't want it to happen anymore." C.A.J.'s foster parents talked to the thirteen-year-old foster child about what had happened, how it started, and why it started, and the thirteen-year-old foster child disclosed "that there was some previous abuse from his own family" that C.A.J.'s foster parents had not been told about. C.A.J.'s foster parents immediately separated the thirteen-year-old foster child and C.A.J. C.A.J.'s foster mother called the DFPS caseworkers who were involved and the "CPS intake hotline." C.A.J.'s foster mother stayed upstairs in their house with the thirteen-year-old foster child and C.A.J.'s foster father went and sat downstairs with C.A.J. Because it was already around 9:00 p.m. when the information was disclosed and reported, that night, C.A.J.'s foster mother slept downstairs on the couch outside the thirteen-year-old foster child's bedroom and C.A.J.'s foster father and C.A.J. both slept upstairs. The foster parents set up two baby monitors in each bedroom "to make sure that no one was crossing paths."

On December 26, 2018, C.A.J.'s foster parents contacted C.A.J.'s therapist, who spoke to C.A.J. that day, and C.A.J.'s foster parents discussed with the therapist what additional support C.A.J. might need as a result of the inappropriate sexual touching incident. C.A.J. and his foster mother also went to stay at a friend's home by themselves for about ten to thirteen days, while C.A.J.'s foster father and the

thirteen-year-old foster child stayed at the family's home until another placement was found for that child. C.A.J.'s foster mother explained that this allowed for at least one parent to remain with each child and ensured that C.A.J. and the thirteen-year-old foster child no longer had any interaction. It was decided that C.A.J. would stay with his foster mother because he would usually seek her out if he needed comforting or if he was struggling with something.

C.A.J.'s foster mother also testified that she and her husband explained to C.A.J. why he and his foster mother would be staying temporarily at a friend's home, and they told him that he could talk about the inappropriate sexual touching incident with them, that it was safe for him to talk to them, and he could ask any questions that he needed to. Additionally, they told C.A.J. that if he did not feel comfortable talking to them, he could talk to his therapist. C.A.J.'s foster mother stated that in her previous training about trauma-informed care, she was taught that when a foster parent talked to a child about sexual abuse, it was not the foster parent's job to investigate or ask questions, the foster parent's job was to support the child and to let the child know that he was okay, that he was safe, and that it was okay to have feelings about whatever was happening. Following the inappropriate sexual touching incident, C.A.J.'s therapist did not have concerns about C.A.J. engaging in inappropriate interactions or behavior with other children.

C.A.J.'s foster mother further explained that DFPS's investigation determined that the thirteen-year-old foster child was the perpetrator of the inappropriate sexual touching incident. C.A.J.'s foster mother stated that had she and her husband known about the thirteen-year old foster child's sexual-abuse history, they would not have had the children interact in the same way. However, without being informed of the sexual-abuse history, they could not have known that allowing C.A.J. and the thirteen-year-old foster child to play video games upstairs together, play outside together, or to campout in the backyard in a tent could have been problematic.

As to C.A.J. in general, his foster mother reported that when C.A.J. first entered his current foster home, he had a hard time listening to any direction that was given and if he was "told no to something, it would trigger a large meltdown." A meltdown usually involved C.A.J. throwing himself on the floor, complaining about whatever was happening, using foul language toward his foster mother, throwing things, including things at his foster mother, tearing apart his room, ripping his bed off of its box spring and taking the sheets off, dumping every toy out of his toy box, and breaking toys. A meltdown could last anywhere from forty minutes to four hours. During a meltdown, C.A.J.'s foster mother would "stand in the same space as [C.A.J.] and let him know that the behavior he was having was not okay." She would talk to C.A.J. about "whatever was upsetting him" and that "breaking things [was] not okay." She would usually let C.A.J. finish having a meltdown and

then discuss with him afterward "what . . . [he] could have done differently." It was important for C.A.J.'s foster mother to stay in the same room with him while he was having a meltdown so that she could make sure that he was safe and that he was not going to hurt himself because he had hit himself in the past and had tried to hit his head on the wall multiple times. If C.A.J. was ever going to hurt himself, she would step in and hold him. She would also ask if he needed something different, like a drink of water or a stuffed animal. C.A.J.'s "really bad tantrums" lasted until about January 2019. At that point, a lot of his meltdowns were under control, and they mostly just consisted of argumentative crying. In C.A.J.'s foster mother's opinion, the consistent structure and boundaries that were set and practiced in the home helped curb C.A.J.'s meltdowns, as did letting C.A.J. know that he could talk to his foster parents and that "nobody was going to be upset with him" because of his feelings. From January 2019 until April 2019, C.A.J.'s foster mother stated that C.A.J. was struggling in school behaviorally, but he was doing well academically. At home, he was just displaying his "normal . . . argumentative behavior[]."

According to C.A.J.'s foster mother, however, when C.A.J. began his visits with mother again in spring 2019, C.A.J. would become upset and start to say things like "you're not my mom, or you can't tell me what to do, or I don't have to listen

to you."[48] C.A.J. would also take the things that mother gave him at their visits and "use them in excess and break them." Before his visits with mother, C.A.J. would say things like "I don't want to go, or this is stupid, why do I have to [go]." And after visits, C.A.J. would have anxiety and would not know what to do. For instance, C.A.J. did not know if he could show his foster parents the things that he received from mother or if he could tell them about his visits. His foster parents would tell him that he could always talk to them about his visits with mother. C.A.J.'s foster mother stated that she and her husband had never tried to dissuade C.A.J. from talking about mother and they had encouraged C.A.J. to talk freely about mother. She told C.A.J. that "his mom is his mom and that would never change, and that she loves him[,] and he loves her, and that's okay." C.A.J. had a "photo box" that his foster parents looked at with him, and he would tell them about his memories with mother and stories about his sister and his grandparents.

C.A.J.'s foster mother stated that she hoped that C.A.J. would be placed wherever he would be the safest, and if it was determined that he could not return to mother's care, then she and her husband would like to adopt him. If C.A.J. continued living with his current foster family, they would continue to support him through therapeutic interventions, behavior modifications at home, and redirection support.

---

[48] C.A.J.'s foster mother testified that neither she nor her husband told C.A.J. that he had to call them "mom" and "dad." C.A.J. could call his foster parents whatever he felt comfortable calling them.

C.A.J.'s foster mother explained that she would continue to take C.A.J. to therapy sessions and help him participate in group therapy if desired. C.A.J. had "[a] lot . . . happen[] in his life," and therapy provided him with "a safe place to talk about that."[49] She would also continue to take C.A.J. to doctor's appointments. At the time of trial, C.A.J. was taking two medications, and C.A.J.'s foster mother believed that the medications helped regulate C.A.J.'s behavior.

C.A.J.'s foster mother noted that neither she nor her husband had a history with cocaine use, alcohol abuse, or prescription-narcotics abuse. She had never been intoxicated and neither she nor her husband had ever been so intoxicated that they were rendered unconscious. C.A.J.'s current foster home was a stable environment. In his foster mother's opinion, it was important for C.A.J. to be in a home that was free from alcohol or narcotics abuse and to have caregivers that were mentally and physically present.

C.A.J.'s foster mother did explain that in February 2019, while she was out of town for a night, C.A.J.'s foster father forgot to give C.A.J. his medications in the morning. At some point that day, C.A.J. told his foster father that he was going to play with a friend across the street, but when the foster father went to check, C.A.J.

---

[49] C.A.J.'s foster mother noted that C.A.J. was placed in his current foster home during the last week in November 2018, and she took him to see a therapist the first week in December 2018. His foster mother also took C.A.J. to his yearly psychological evaluation in 2019 as instructed by DFPS. And she took him to see his primary care physician and for appointments with his psychiatrist.

was not there. C.A.J.'s foster father called his wife to see if she knew what other friends C.A.J. would have gone to play with, and C.A.J.'s foster mother told him about two other neighborhood homes because "sometimes all of the kids run together." C.A.J.'s foster father was then able to find C.A.J. C.A.J.'s foster mother explained that usually C.A.J. was "pretty good about coming home and saying, Mom, I'm going here, or can I go here, and letting [them] know." But also C.A.J.'s foster mother knew the parents at the homes that C.A.J. played at and she communicated with them. She was comfortable that those parents could provide adequate supervision for C.A.J. while he played with his friends.

### Mother

Mother testified that she had two children: C.A.J. and M.W., C.A.J.'s sister, who was seventeen years old at the time of trial. Mother stated that she was employed at a restaurant as a server,[50] and she lived in Portland, Texas. Although mother had lived in Portland since October 2018, she also sought treatment at multiple rehabilitation facilities located in other areas of Texas during the pendency of the termination case. At the time of trial, mother's nursing license was delinquent, but according to mother, it had not been revoked. Mother stated that she received

---

[50] Mother stated that she had also worked at a treatment center during the pendency of the termination case.

an FSP in February 2018 that provided her with a list of requirements which she believed she had completed.

Mother also testified that she had a "better support system" in place at the time of trial than she had in the past. Her support system included her best friend, Robert, her parents, her girlfriend, Amber, her sponsor, and "people at work."

Regarding her criminal history, mother testified that in 2002 she was convicted of the offense of theft.[51] On March 3, 2003, mother was arrested for the offenses of possession of marijuana, theft, and "forgery due to fraud or harm."[52] On May 30, 2003, she was arrested for the offense of "stealing and receiving a stolen check," and on October 14, 2003, she was arrested for the offense of possession of a controlled substance.[53] At some point in 2003, mother was convicted of the offense of forgery of a financial instrument and her punishment was assessed at confinement

---

[51] Certain exhibits that the trial court admitted into evidence state that on October 9, 2002, mother entered a plea of nolo contendere to the misdemeanor offense of theft. Mother was convicted of the misdemeanor offense of theft, and her punishment was assessed at confinement for five days.

[52] Scott's CPS Investigation Report states that on March 3, 2003, mother was arrested for the offenses of possession of marijuana, theft, and "forgery to defraud or harm . . . another."

[53] The trial court admitted into evidence a copy of a February 5, 2004 judgment stating that mother pleaded guilty to the felony offense of possession of a controlled substance, namely methamphetamine, weighing less than one gram, which had occurred on October 14, 2003. The trial court assessed her punishment at confinement for 180 days. Certain other exhibits that the trial court admitted into evidence state that on February 5, 2004, mother pleaded guilty to the felony offenses of forgery and possession of a controlled substance and her punishment was assessed at confinement for 180 days.

39

for 180 days.[54] Further, in April 2004 and May 2004, mother was convicted of multiple offenses of forgery of a financial instrument and she was sentenced to eight months confinement for one offense and nine months confinement for the other offense.[55] In June 2011, mother was arrested for the offense of driving while intoxicated, and in June 2012, when C.A.J. was an infant, mother was placed on community supervision for twelve months related to that offense.[56] Additionally, on April 28, 2012, when C.A.J. was five weeks old, mother was arrested for the offense of assault, but, according to mother, the criminal charges were later dismissed.[57] On

---

[54] Scott's CPS Investigation Report states that mother was arrested for the offense of forgery of a financial instrument on October 14, 2003. And certain other exhibits that the trial court admitted into evidence state that on December 11, 2003, mother was convicted of "3 counts" of the felony offense of debit card abuse and the felony offense of "[f]raudulent [u]se or [p]ossession of [i]dentifying [i]nformation" and her punishment was assessed at confinement for six months.

[55] Certain exhibits that the trial court admitted into evidence state that on May 28, 2004, mother was convicted of the felony offense of forgery and her punishment was assessed at confinement for nine months. Further, the exhibits state that on June 16, 2004, mother was convicted of another felony offense of forgery and her punishment was assessed at confinement for eight months. And on October 4, 2004, mother was convicted of the felony offense of forgery of a commercial instrument or check and her punishment was assessed at confinement for one year. Mother was also ordered to pay $2,923 to the complainant.

[56] The trial court admitted into evidence a copy of a February 28, 2012 judgment stating that mother pleaded guilty to the offense of driving while intoxicated, which occurred on June 11, 2011. The trial court assessed mother's punishment at confinement for 180 days, suspended mother's sentence, and placed her on community supervision for twelve months.

[57] The trial court admitted into evidence a copy of a judgment stating that mother pleaded guilty to the offense of assault of a family member, which occurred on April 28, 2012. The trial court deferred adjudication of mother's guilt and placed her on community supervision for twenty-four months. As to that incident, mother stated

40

June 27, 2016, mother was arrested for the offense of driving while intoxicated with a child. At trial, mother admitted to consuming alcohol that day and "end[ing] up unconscious behind the wheel" with C.A.J. in the car. Mother also testified that in January 2019, she was "pulled over on the side of the road" by a law enforcement officer. Mother stated that she was not intoxicated that day; instead, her "blood sugar[] . . . was 45." But she stated that she "couldn't even drive" at the time.

Regarding her history with DFPS, mother testified that DFPS received a referral in fall 2012, when mother was living in Harlingen, Texas, alleging that mother was "passed out on the floor of [her] apartment" while C.A.J., an infant, was asleep in his baby swing. DFPS received a second referral in November 2012, and C.A.J. was removed from mother's care after she was transported to the hospital. According to mother, she had taken medication for a headache or migraine and had a reaction to it. The person who owned the daycare that C.A.J. attended at the time arrived at mother's home that day and called for emergency assistance because mother was unconscious, asleep, or "passed out" with C.A.J. in her care. C.A.J. was later returned to mother's care in January 2013, but then re-removed until October 2013, when he was again returned to her care.

---

that her girlfriend at the time was changing C.A.J.'s diaper when mother told her that their relationship was over. Her girlfriend then "pushed [mother] into the laundry room" and mother grabbed a "[large]-sized detergent and [was] able to get her [girlfriend] away from" her.

Mother further explained that DFPS became involved with her and C.A.J. again in June 2016 when mother was found "[p]assed out" in her car at a red light with C.A.J. in the back seat. Mother noted that there was alcohol in her car and that she was unconscious. She clarified that C.A.J. was buckled in his car seat when she stopped at the light, but she stated that C.A.J. could get out of his car seat on his own. Mother could not say whether or not she had alcohol in her system that day, but she stated that she was not driving while intoxicated and her low blood sugar had caused her to pass out.[58] Mother explained that she was arrested on June 27, 2016 and charged with a felony offense, but the case against her was dismissed. C.A.J. was removed from mother's care on June 27, 2016 because of the above-described incident and then returned to mother's care later in 2016.

Regarding the circumstances involved in the termination case, mother testified that she took C.A.J. to West Oaks in January 2018 because he was hallucinating, said that he wanted to kill mother and himself, was exhibiting aggressive behavior, and had been lying. Mother explained that C.A.J. would say that he "want[ed] to die" when "he was mad and he didn't get his way." C.A.J. was also getting in trouble at school. Such misbehavior had been going on for about six

---

[58] A supplemental note to the "Incident/Investigation Report" from the June 27, 2016 incident involving mother states that mother's blood alcohol concentration that day was 0.29.

to eight weeks before mother took him to West Oaks, meaning that C.A.J.'s misbehavior started around November 2017.[59]

In January 2018, C.A.J. was removed from mother's care. When mother spoke to DFPS Investigator Scott, she admitted to using cocaine. But she did not know how C.A.J. could have ingested cocaine, and she stated that he did not get cocaine from her. Mother conceded that her cocaine use was dangerous and exposed her to being arrested and to the possibility of incarceration.

As to mother's history with substance abuse and her participation in various substance-abuse treatments, mother noted that she had been "an addict" for "a lot of [her] adult life." She first started abusing alcohol in 2012. She explained that in 2012, after C.A.J. was removed from her care by DFPS, mother sought treatment for alcohol abuse at Charlie's Place Recovery Center in Corpus Christi. Mother got sober in 2013 and then relapsed by consuming alcohol again in 2016. After C.A.J. was removed from her care in June 2016, mother sought treatment for alcohol abuse. In November 2017, mother started using narcotics. Mother used cocaine with a doctor that she worked with, and she engaged in cocaine use while C.A.J. was with his babysitter. Despite her narcotics-use testing results, mother denied engaging in daily cocaine use. But mother stated that she tested positive for cocaine use while

---

[59]    Mother stated that she began using cocaine in November 2017, while C.A.J. was in her care. Mother also admitted that she had used cocaine on January 12, 2018, while C.A.J. was being treated at West Oaks.

she was working at a hospital as a registered nurse and a default order was later entered against her which revoked her nursing license.[60]

After C.A.J. was removed from mother's care in January 2018, mother entered Nexus Recovery in Dallas for sixty days and completed the program. After leaving

---

[60] The trial court admitted into evidence a copy of the "Formal Charges" brought against mother by the Texas Board of Nursing which states:

> On or about November 28, 2017, while employed as a Registered Nurse with Ben Taub Hospital - Emergency Center, Houston, Texas, [mother] lacked fitness to practice nursing in that she exhibited signs of impaired behavior while on duty, including, but not limited to: overly exaggerated and confusing responses. [Mother's] condition could have affected her ability to recognize subtle signs, symptoms or changes in patients' conditions, and could have affected her ability to make rational, accurate, and appropriate assessments, judgments, and decisions regarding patient care, thereby placing the patients in potential danger.
>
> . . . .
>
> [Further,] [o]n or about November 28, 2017, while employed as a Registered Nurse with Ben Taub Hospital - Emergency Center, Houston, Texas, [mother] engaged in the intemperate use of [c]ocaine in that she produced a specimen for a drug screen which resulted positive for [c]ocaine. Furthermore, [mother] admitted to facility staff that she would test positive for [c]ocaine. Unlawful possession of [c]ocaine is prohibited by Chapter 481 (Controlled Substances Act) of the Texas Health & Safety Code. The use of [c]ocaine by a [n]urse, while subject to call or duty, could impair the nurse's ability to recognize subtle signs, symptoms, or changes in a patient's condition, and could impair the nurse's ability to make rational, accurate, and appropriate assessments, judgments, and decisions regarding patient care, thereby placing a patient in potential danger.

Mother testified that she petitioned to have an order revoking her nursing license set aside, and she had been granted a rehearing. Thus, at the time of trial, it did not appear that mother's nursing license had been formally revoked. Mother did admit to previously being placed on probation by the Texas Board of Nursing for failing to submit to random narcotics-use testing.

Nexus Recovery, mother relapsed by using prescription Xanax. After her relapse, mother sought treatment at Cenikor rehabilitation facility in Deer Park because she was using benzodiazepines or Xanax "too much." According to mother, she had become addicted to her prescription narcotics. Mother believed that she had successfully completed the short-term program, about three weeks, at Cenikor, but according to mother, she was hospitalized for "blood sugar." After her hospitalization, mother stated that she "went back to the long-term program," which she estimated was about twenty-four or twenty-five days. Mother testified that if the records from Cenikor state that she did not complete the program, then the records are incorrect.

Mother further testified that after she left Cenikor she "stayed clean," but she used the prescription narcotics that had been prescribed to her. And she sought outpatient treatment at Billy T. Cattan Recovery in Victoria while living with her parents in Waco. Mother stated that she was unsuccessfully discharged from that rehabilitation program because of "hospitalizations." Mother then sought treatment at La Hacienda in Kerrville for opioid-use disorder and sedative-use disorder because she did not want to take the prescription narcotics that she was prescribed. When mother entered treatment at La Hacienda in February 2019—more than one year after C.A.J. had been removed from her care— she was not lucid, she almost overdosed, and she was taken to the hospital. Mother successfully completed her

45

treatment at La Hacienda and was discharged on March 29, 2019. Mother then "chose to go to extended care" in Austin. Although she was at that the Austin facility for "a few weeks," she was told that she could not stay because "they were too concerned about [her] blood sugar dropping without having medical professionals on staff." Mother stated that she had been sober since February 21, 2019, and at the time of trial, she was participating in a twelve-step program and had a sponsor. Mother agreed that May 2019 was the first time during the pendency of the termination case that she received negative narcotics-use testing results.

Regarding her health, mother testified that she had been diagnosed with endocrine neoplasia, type 1. She stated that since 2012, when DFPS became involved with her and C.A.J., she had reported that she had ulcerative colitis, aplastic anemia, depression, tumors, pituitary issues, a pancreatic tumor, pancreatic pain, and hypoglycemia. Mother stated that she went to the emergency room between five and ten times since January 2018. While in the emergency room, she was sometimes given narcotics as well as on-going prescriptions for narcotics.

As to C.A.J., mother noted that any time she was unconscious, whether due to a medical issue or alcohol or narcotics use, she was unable to provide care for C.A.J. and that could be dangerous for C.A.J. And she admitted that some of her choices in the past had put C.A.J. at risk.

46

*Mother's FSP*

The trial court admitted into evidence a copy of mother's FSP, which states that on January 12, 2018, DFPS received a referral for negligent supervision of C.A.J. by mother. The referral alleged C.A.J. had tested positive for cocaine use and that "there may be drugs in the home." Regarding "[i]nitial concerns" of DFPS, mother's FSP states that mother had not "demonstrated an ability to stay sober/drug free and in recovery to ensure that [C.A.J. would be] safe from harm," mother's "drug/alcohol addiction affect[ed] the quality of care that she [was] able to provide" to C.A.J., mother had a prior history with DFPS "in which there were [other] removals" of C.A.J. from mother's care, mother "admitted to using cocaine," and mother's "drug addiction impair[ed] her protective capacity to take care of [C.A.J.]"

Mother's FSP lists the following tasks that she was required to complete during the pendency of the termination case: (1) provide the DFPS caseworker with names, addresses, and telephone numbers of any relatives or friends that may be a possible placement for C.A.J.; (2) attend all court hearings and permanency conference meetings; (3) maintain contact with the DFPS caseworker in person or via telephone at least monthly; (4) notify the DFPS caseworker within forty-eight hours of any change in contact information or housing; (5) be available by reasonable request and allow the DFPS caseworker to conduct random and scheduled home visits; (6) have stable employment or income to meet the family's

basic needs; (7) provide the DFPS caseworker with paystubs or income verification every month; (8) maintain stable housing, that is safe, clean, and free from hazards, and demonstrate the ability to keep a stable environment for the family; (9) provide the DFPS caseworker with housing agreement or utility bill; (10) participate in supervised visits with C.A.J. and if mother is unable to make a scheduled visit, notify the DFPS caseworker twenty-four hours in advance; (11) actively participate in parenting classes in person and successfully complete the parenting classes and provide the DFPS caseworker with a certificate of completion within seven days of the last class date; (12) demonstrate learned behaviors from the parenting class during family visits; (13) sign a release of information so that DFPS can have access to mother's records; (14) submit to random narcotics-use testing; (15) participate in family-therapy sessions with C.A.J.; (16) attend and actively participate in a "drug assessment" and follow all recommendations given; (17) successfully complete the treatment program at Nexus Recovery in Dallas; and (18) participate in a psychological and psychiatric evaluation and follow all recommendations.

### C.A.J.'s 2019 Psychological Evaluation

The trial court admitted into evidence a copy of C.A.J.'s psychological evaluation from February 2019.[61] The evaluation states that C.A.J. and his current

---

[61] The trial court also admitted into evidence copies of other earlier psychological evaluations of C.A.J.

foster mother were present for the evaluation. It notes that C.A.J. appeared well groomed and was happy and engaging. His appearance was appropriate for his age, and he was cooperative and respectful. He maintained eye contact, his thought process was logical, his attention was sufficient, and he appeared insightful. C.A.J. reported that he liked playing outside, sports, riding a bicycle, and baseball.

C.A.J.'s foster mother described C.A.J.'s environment with his foster family as normal, stable, and laid back. She reported that C.A.J. was adjusting well to the home and the family had established a consistent routine. C.A.J.'s foster mother worked from home and his foster father worked outside of the home from approximately 7:00 a.m. to 6:00 p.m. C.A.J. called his foster parents "mom" and "dad." C.A.J. did not like to be left with other people and did not like strangers. When C.A.J. would feel uncomfortable, he sought out his foster parents. C.A.J. was proud of his foster family and "like[d] that he [was] part of a big family," which included nineteen aunts and uncles.

C.A.J.'s foster mother also reported that C.A.J. had friends in his neighborhood and at school and his friends were positive influences. She stated that when C.A.J. would be "in his own space" he could be self-centered and "d[id] not like to share." But C.A.J. did "fairly well when he [was] outside of his own space and [he was] more willing to share" under those circumstances. C.A.J. was an outgoing child.

C.A.J attended elementary school, and in 2019, he was in the first grade. C.A.J.'s foster mother reported that he received "straight A's." C.A.J. enjoyed school and felt confident in his ability to understand the concepts that were being taught. His strengths were math and art, and art was calming for C.A.J. When C.A.J. first began living with his foster family, his foster mother received daily notes from school about C.A.J.'s misbehavior, but that had decreased, and he went an entire month without any notes from school.

Regarding mother, C.A.J.'s foster mother reported that mother's influence affected C.A.J.'s behavior. His behavior would change after he had interactions with mother. Mother corrected C.A.J. and told him to call his foster parents by their first names. After visits with mother, C.A.J. acted out, used "foul language," and was disrespectful. C.A.J. had a "the world revolves around me" attitude, especially after a visit with mother.

C.A.J.'s foster mother also reported, related to mother's influence on C.A.J.'s behavior, that C.A.J. hit a teacher, laughed at a teacher, and talked over a teacher at school. And he had pushed another child at school and was involved in a physical altercation with a neighborhood child which the other child allegedly instigated. C.A.J. had verbal and physical meltdowns when he did not get his way. C.A.J., while in the care of his current foster parents, saw a therapist once a week.

The "Conceptualizations" section of C.A.J.'s evaluation states the following:

[C.A.J.] is a six-year old [child] who is presently residing with his foster parents . . . since December 2018. [C.A.J.] has a reported history of trauma that includes neglect that led to him being removed from his mother's care and sexual abuse while in foster care. . . . [C.A.J.] has displayed significant behavior difficulties in a previous foster home as well as at his current placement. [His foster mother] described [C.A.J.] as having difficulty with attention, being defiant, not following the rules, adapting to change, [being] fidgety, [being] easily distracted, pushing boundaries, [having] physical and verbal aggression, and having strong emotional reactions to events and stressors. She further noted [that] he was hospitalized for making comments that he heard voices that told him to do things, [having a] suicide attempt and being under the influence of cocaine. [C.A.J.] has adjusted well to his [current] foster home and he appears to be doing well. [C.A.J.] has [a] history of significant emotional reactions as reported by previous foster parents as noted in previous psychological [evaluations] after visitations with his mother. Close monitoring of any visitations with mother is suggested as well as therapy sessions shortly after [C.A.J.'s visits with mother which would] allow [C.A.J.] the opportunity to process his emotions, if any contact with mother continues. His emotional reactions after contact with his mother has greatly impacted his ability to function at school and his placements as it takes days for [C.A.J.] to be able to regain some emotional stability.

. . . [C.A.J.] yielded several at-risk and clinically significant scores in areas such as hyperactivity, atypicality, attention problems, adaptive skills[,] and social skills . . . . This may indicate [that C.A.J.] may have difficulty maintaining necessary levels of attention at school and this may disrupt academic performance and functioning in other areas. . . . [C.A.J.] meets the criteria for [ADHD]. . . . According to the [psychological testing] results, [C.A.J.] has difficulty maintaining attention as well as experiencing hyperactivity/attention problems and his difficulties are impacting his school and home life. He has a reported history of being diagnosed with ADHD. [C.A.J. also] meets the criteria for [ODD]. [C.A.J.] often loses [his] temper, [is] irritable, refuses to comply[,] or has problems with authority. It was reported [that] he has a history of becoming physically aggressive towards authority and peers. He was previously diagnosed with ODD.

51

The evaluation provides the following diagnoses for C.A.J.: ADHD, ODD, DMDD, and unspecified trauma and stressor related disorder. The evaluation recommends that C.A.J. participate in art therapy, individual therapy, family therapy, and athletic programs. More specifically, regarding therapy, the evaluation states that C.A.J. would benefit from participating in individual therapy on a consistent basis with a therapist who is adept in cognitive behavioral therapy or art therapy. Therapy should address "coping with [his] parent's neglect, verbalizing feelings, emotional regulation, and . . . strategies to manage [his] ADHD symptomology." It also recommended that C.A.J.'s caretaker employ an authoritative parenting style with him, meaning that his caretaker should set high yet achievable expectations and provide clear guidelines for C.A.J. while still being responsive and nurturing through encouragement, praise, positive reinforcement, and affection.[62] Additionally, C.A.J. should participate in extracurricular activities, with a focus on non-contact sports to minimize the possibility of altercations. Any

---

[62] DFPS Caseworker Owens testified that a previous psychological evaluation recommended that C.A.J. have structure, a nurturing environment, close supervision, and constant discipline when he was misbehaving. It also recommended that C.A.J. participate in play therapy. Owens stated that another prior psychological evaluation recommended therapy to address C.A.J.'s anger issues.

educational needs should also be addressed, including certain listed accommodations at school.[63]

## Sufficiency of Evidence

In her first issue, mother argues that the trial court erred in terminating her parental rights to C.A.J. because the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights was in the best interest of C.A.J. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more

---

[63] We note that additional witnesses testified at trial on behalf of both parties. The Court has reviewed the complete record in this appeal, including all testimony and evidence presented to the trial court. *See* TEX. R. APP. P. 47.1; *Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *18 n.19 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.); *Sullivan v. Arguello Hope & Assocs., PLLC*, No. 03-18-00144-CV, 2018 WL 6424200, at *1 n.2 (Tex. App.—Austin Dec. 7, 2018, no pet.) (mem. op.) ("Because the parties are familiar with the facts of the case and its procedural history, we do not recite them in this opinion except as necessary to advise the parties of the Court's decision and the basic reasons for it.").

precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a

reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). But this does not mean we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then

55

the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (both elements must be established). Multiple non-exclusive factors are considering when determining a child's best interest. *See* TEX. FAM. CODE ANN. § 263.307; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

In her first issue, mother argues that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights was in the best interest of C.A.J. because the jury's best-interest finding is not supported by the factors set out in Texas Family Code section 263.307 or *Holley*.

In an appeal from a judgment rendered on the basis of a jury verdict, including a trial court's judgment terminating a parent's rights to her minor child, a party cannot complain about the legal or factual sufficiency of the evidence for the first time on appeal. *See* TEX. R. APP. P. 33.1(d); *In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *4 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) (mem. op.). To preserve for appellate review a challenge to the legal sufficiency of

the evidence, a party must: (1) move for an instructed verdict; (2) object to the submission of a jury question; (3) move for judgment notwithstanding the verdict; or (4) move for a new trial. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *In re J.M.S.*, 43 S.W.3d 60, 62 (Tex. App.—Houston [1st Dist.] 2001, no pet.). To preserve for appellate review a challenge to the factual sufficiency of the evidence, a party must move for a new trial. *See* TEX. R. CIV. P. 324(b)(2), (3); *Cecil*, 804 S.W.2d at 510; *In re J.M.S.*, 43 S.W.3d at 62. And the party's motion or objection must be reasonably specific as to the nature of the evidentiary sufficiency challenge that is being made to preserve a sufficiency-point for appellate review. *See* TEX. R. APP. P. 33.1(a); *In re S.G.*, 2019 WL 1448870 at *4.

Here, the jury found that mother's parental rights to C.A.J. should be terminated,[64] and thus, the trial court, in its judgment, terminated mother's parental rights. Although mother challenges on appeal the legal and factual sufficiency of the evidence supporting the jury's finding that termination of her parental rights was in the best interest of C.A.J., she did not move for an instructed verdict, object to the submission of a jury question, move for judgment notwithstanding the verdict, or move for a new trial. Accordingly, we hold that she has not preserved her

---

[64] In doing so, the jury found, by clear and convincing evidence, that mother committed one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of her parental rights was in the best interest of C.A.J. *See* TEX. FAM. CODE ANN. § 161.001(b); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

sufficiency-complaints for our review. *See In re S.G.*, 2019 WL 144887, at \*4; *In re J.M.S.*, 43 S.W.3d at 62.

**Managing Conservatorship**

In her second issue, mother argues that the trial court erred in "disregarding the jury's finding [that] DFPS should *not* be [appointed as C.A.J.'s] managing conservator" and in appointing DFPS as C.A.J.'s sole managing conservator because the trial court could not override the jury's conservatorship verdict.

The Texas Family Code provides that "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE ANN. § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at \*8 (Tex. App.— Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, [Texas] Family Code section 161.207 governs the appointment of a managing conservator."). Generally, we review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to her child. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at \*9

58

(Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.). A parent with no legal rights with respect to her child lacks standing to attack the portion of the trial court's order appointing DFPS as the sole managing conservator of the child. *See A.L.J.*, 2019 WL 4615826, at *9.

Here, we have held that mother did not preserve for our review her complaint that the trial court erred in terminating her parental rights to C.A.J. because the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights was in the best interest of C.A.J. Because mother did not preserve her sufficiency-complaints for our review, she is bound by the trial court's order terminating her parental rights to C.A.J. *See In re Y.V.*, No. 02-12-00514-CV, 2013 WL 2631431, at *1–2 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.); *In re R.A., Jr.*, No. 07-08-0084-CV, 2009 WL 77853, at *2 (Tex. App.—Amarillo Jan. 13, 2009, no pet.) (mem. op.). As such, mother has become a former parent with no legal rights with respect to C.A.J. *See In re Y.V.*, 2013 WL 2631431, at *1–2; *In re R.A., Jr.*, 2009 WL 77853, at *2.

Having no legal rights with respect to C.A.J., we hold that mother lacks standing to challenge the portion of the trial court's order appointing DFPS as sole managing conservator of C.A.J. *See In re A.L.J.*, 2019 WL 4615826, at *9 ("Mother does not have standing to challenge the portion of the order appointing [DFPS] as permanent managing conservator of the children because any alleged error could not

59

injuriously affect her rights."); *In re Y.V.*, 2013 WL 2631431, at *1–2; *In re H.M.M.*, 230 S.W.3d 204, 204–05 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

We overrule mother's second issue.

## Ineffective Assistance of Counsel

In her third issue,[65] mother argues that the trial court erred in terminating her parental rights to C.A.J. because her retained trial counsel did not provide her with effective assistance at trial. *See* U.S. CONST. amend. VI; *see also In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). Mother asserts that her trial counsel did not object to certain portions of the trial court's charge to the jury or make proffers and counsel did not "object to the [trial] court's responses to the jury's questions."

We first address DFPS's argument that mother cannot seek reversal of the trial court's judgment terminating her parental rights to C.A.J. based on any alleged ineffective assistance of her trial counsel because mother's trial counsel was retained rather than appointed.[66] We have previously addressed the merits of a parent's claim

---

[65] To the extent that mother asserts, as part of her third issue, that the trial court erred in "not correctly charging the jury," we hold that mother has not preserved that complaint for appellate review. *See In re B.L.D.*, 113 S.W.3d 340, 349–50 (Tex. 2003) ("[T]he failure to raise a complaint at trial to a jury charge waives review of that complaint on appeal."); *In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) (mem. op.); *see also* TEX. R. APP. P. 33.1; TEX. R. CIV. P. 274.

[66] This issue is currently pending before the Texas Supreme Court. *See In re D.T.*, 593 S.W.3d 437, 439–40 (Tex. App.—Texarkana 2019, pet. granted) (holding parent who hires own attorney cannot assert ineffective-assistance-of-counsel complaint).

for ineffective assistance of counsel when the parent had retained counsel at trial. *See L.F. v. Dep't of Family & Protective Servs.*, Nos. 01-10-01148-CV, 01-10-01149-CV, 2012 WL 1564547, at *12 n.9 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. denied) (mem. op.); *In re V.V.*, 349 S.W.3d 548, 558–61 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *16, *21–23 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.); *In re E.R.W.*, 528 S.W.3d 251, 257–61 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (non-indigent parent may challenge judgment in suit by governmental entity to terminate parent-children relationship based on alleged ineffective assistance of retained counsel); *In re D.J.W.*, 394 S.W.3d 210, 218–19, 218 n.9 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (addressing mother's ineffective-assistance-of-counsel complaint and declining to hold that mother, who had retained trial counsel, could not raise claim of ineffective assistance of counsel on appeal); *Donihoo v. Lewis*, No. 01-08-099277-CV, 2010 WL 1240970, at *11 (Tex. App.—Houston [1st Dist.] Mar. 25, 2010, pet. denied) (mem. op.) ("We recognize that the constitutional right to effective assistance of counsel has been extended to certain civil proceedings,

61

such as termination of parental rights cases . . . .”).  Thus, we will do so in this case as well.[67]

The statutory right to counsel in a termination-of-parental-rights case includes, as a matter of due process, the right to effective counsel.  *C.S.F. v. Tex. Dep't of Family & Protective Servs.*, 505 S.W.3d 618, 619–20 (Tex. 2016); *In re M.S.*, 115 S.W.3d at 544; *In re A.A.H.*, 2020 WL 1056941, at \*21.  To evaluate claims of ineffective assistance of counsel in termination-of-parental-rights cases, the Texas Supreme Court has adopted the ineffective-assistance-of-counsel standard applied in criminal cases and set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See In re M.S.*, 115 S.W.3d at 544–45; *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 622–23 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  Thus, proving a claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, i.e., "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment," and (2) the deficient performance of counsel prejudiced the defense in a manner "so serious as to deprive the [parent] of a fair trial, a trial whose result is reliable."  *In re M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 687); *see also In re H.R.M.*, 209 S.W.3d at 111;

---

[67]  We note that irrespective of whether we review the merits of mother's ineffective-assistance-of-counsel complaint, the outcome of mother's appeal remains unchanged.  *See infra.*

62

*In re A.A.H.*, 2020 WL 1056941, at *21. To establish an ineffective-assistance-of-counsel claim, a parent must successfully show both prongs of the test. *In re M.S.*, 115 S.W.3d at 545; *Walker*, 312 S.W.3d at 622–23; *see also In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). A parent's failure to satisfy one prong negates the court's need to consider the other prong. *See Strickland*, 466 U.S. at 697; *In re E.R.W.*, 528 S.W.3d at 262; *see also In re A.A.H.*, 2020 WL 1056941, at *21 (parent has burden to prove by preponderance of evidence).

In analyzing whether counsel's performance was deficient, the Texas Supreme Court has explained that, "tak[ing] into account all of the circumstances surrounding the case," a court "must primarily focus on whether counsel performed in a reasonably effective manner." *In re M.S.*, 115 S.W.3d at 545 (internal quotations omitted); *see also In re H.R.M.*, 209 S.W.3d at 111; *Walker*, 312 S.W.3d at 622. A court "must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic." *In re M.S.*, 115 S.W.3d at 545 (internal quotations omitted); *see also In re H.R.M.*, 209 S.W.3d at 111; *Walker*, 312 S.W.3d at 622. We may not speculate to find trial counsel ineffective. *Walker*, 312 S.W.3d at 623; *see also In re A.A.H.*, 2020 WL 1056941, at *21–22 ("An assertion of ineffective assistance will be sustained only if the record affirmatively supports such a claim."). Challenged conduct constitutes

ineffective assistance only when it is "so outrageous that no competent attorney would have engaged in it." *In re M.S.*, 115 S.W.3d at 545 (internal quotations omitted); *see also In re H.R.M.*, 209 S.W.3d at 111; *Walker*, 312 S.W.3d at 622.

"Ordinarily, counsel should not be condemned as unprofessional or incompetent without an opportunity to explain the challenged actions." *In re A.A.H.*, 2020 WL 1056941, at *22 (internal quotations omitted); *see also In re S.L.*, 188 S.W.3d 388, 395 (Tex. App.—Dallas 2006, no pet.). "Thus, when the record is silent regarding counsel's reasons for h[er] conduct," as it is here, "we defer to counsel's decision if there is at least the possibility that the conduct could have been legitimate trial strategy." *In re A.A.H.*, 2020 WL 1056941, at *22 (internal quotations omitted); *see also In re S.L.*, 188 S.W.3d at 395. In other words, without testimony from trial counsel, we must presume that counsel had a plausible reason for her conduct. *In re K.H.M.*, 181 S.W.3d 1, 7 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

In addition to showing trial counsel's deficient performance, a parent must show that her trial counsel's deficient performance prejudiced her defense. *See In re J.O.A.*, 283 S.W.3d at 344; *In re V.V.*, 349 S.W.3d at 559. To satisfy this burden, the record must permit the reviewing court to determine that there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different, i.e., the parent's parental rights to her child would not have been terminated. *In re M.S.*, 115 S.W.3d at 549–50; *see also Medellin v. Tex. Dep't of*

64

*Family & Protective Servs.*, No. 03-11-00558-CV, 2012 WL 4466511, at *5 (Tex. App.—Austin Sept. 26, 2012, pet. denied) (mem. op.) (father must show "reasonable probability that his parental rights would not have been terminated"). In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 476 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.).

Mother first argues that her retained trial counsel did not provide her with effective assistance at trial because counsel did not object to the trial court's charge which allowed the jury to terminate mother's parental rights based on her purported failure to complete her FSP. According to mother, "the record conclusively establishe[d] [that] [m]other completed" her FSP. And her counsel's failure to object to the trial court's charge because there was no evidence that mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of C.A.J. prevented mother from challenging on appeal the trial court's broad-form submission to the jury. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *see also In re B.L.D.*, 113 S.W.3d 340, 349–50 (Tex. 2003) (complaints of error in broad-form submission must be preserved by objection at trial).

65

In its charge to the jury, the trial court instructed the jury that to terminate the parent-child relationship between mother and C.A.J., it must have been proven by clear and convincing evidence that termination of mother's parental rights was in the best interest of C.A.J. and that at least of one of the following had occurred:

- Mother "knowingly placed or knowingly allowed [C.A.J.] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of [C.A.J.]";

- Mother "engaged in conduct that knowingly placed [C.A.J.] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of [C.A.J.]";

- Mother "failed to comply with the provisions of a court order that specifically established the actions necessary for [mother] to obtain the return of [C.A.J.] who ha[d] been in temporary managing conservatorship of [DFPS] for not less than nine months as a result of [C.A.J.'s] removal from [mother] under Chapter 262 (Procedures in Suit by Governmental Entity) for the abuse or neglect of [C.A.J.]"; or

- Mother "used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health and safety of [C.A.J.], and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after competition of a court-ordered substance abuse treatment program continued to abuse a controlled substance[.]"

These instructions were followed by Question 1, which asked the jury: "Should the parental rights of mother . . . be terminated as to [C.A.J.]?" The jury answered: "Yes."

Although mother asserts that there is no evidence that she failed to comply with the provisions of a court order that specifically established the actions necessary

for her to obtain the return of C.A.J., we disagree. *Cf. In re B.S.*, No. 09-06-293-CV, 2007 WL 1441273, at *4 (Tex. App.—Beaumont May 17, 2007, no pet.) (mem. op.) (parent argued trial counsel ineffective for not objecting to jury charge where no evidence showed she failed to regularly visit or maintain contact with her children and thus jury should not have been allowed to consider that ground for termination purposes).

Mother's FSP, a copy of which the trial court admitted into evidence, required mother to "attend all court hearings[] [and] permanency conference meetings," maintain "stable employment or income to meet [her] family's basic needs," "provid[e] the [DFPS] caseworker with paystubs or income verification every month," and "participate in supervised visits" with C.A.J. If mother was unable to make a scheduled visit, she was required to call the DFPS caseworker "24 hours in advance." Mother's absence from a visit without notice constituted a failure to comply with a requirement of her FSP.

DFPS caseworker Owens testified that mother missed two court hearings during the pendency of the termination case, and mother did not provide Owens with monthly proof that she had stable employment. Mother also missed her scheduled February 2018 visit with C.A.J. According to Owens, although C.A.J.'s foster mother brought C.A.J. to the scheduled visit, Owens had to call mother to find out

67

where she was because mother was late. Mother showed up to the visit two hours late and after C.A.J. had left.

The record contains some evidence that mother did not comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of C.A.J. *Cf. In re B.S.*, 2007 WL 1441273, at \*4. A trial court must submit the questions, instructions, and definitions raised by the written pleadings and the evidence. TEX. R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). If there is some evidence to support the submission of an instruction, a trial court commits reversible error if it fails to submit the instruction. *4901 Main, Inc. v. TAS Auto., Inc.*, 187 S.W.3d 627, 630–31 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Some evidence supported the trial court's instruction to the jury that the parent-child relationship between mother and C.A.J. may be terminated if it was proven by clear and convincing evidence that termination of mother's parental rights was in the best interest of C.A.J. and mother "failed to comply with the provisions of a court order that specifically established the actions necessary for [mother] to obtain the return of [C.A.J.] who ha[d] been in temporary managing conservatorship of [DFPS] for not less than nine months as a result of [C.A.J.'s] removal from [mother] under Chapter 262 (Procedures in Suit by Governmental Entity) for the abuse or neglect of [C.A.J.]" And, as such, we cannot conclude that mother's trial counsel's performance was deficient because she failed

68

to object to a properly submitted instruction to the jury. *See In re B.S.*, 2007 WL 1441273, at *4 (trial counsel's performance was not deficient for not objecting to trial court's charge where some evidence supported trial court's submission of instruction to jury in termination-of-parental-rights case); *In re S.A.S.*, 200 S.W.3d 823, 828–30 (Tex. App.—Beaumont 2006, pet. denied) ("[I]t is not ineffective assistance for an attorney to fail or refuse to make objections to a charge that have no arguable basis."); *see also In re J.F.C.*, 96 S.W.3d at 283 (holding counsel's failure to object to broad-form submission of termination issues not deficient where Texas Supreme Court had approved broad-form submission in termination-of-parental-rights cases); *Kennedy v. State*, No. 01-92-01056-CR, 1994 WL 649090, at *9 (Tex. App.—Houston [1st Dist.] Nov. 17, 1994, pet. ref'd) (not designated for publication) ("Failure to object to an acceptable jury charge is not ineffective assistance.").

Mother next argues that her retained trial counsel did not provide her with effective assistance at trial because counsel did not object to irrelevant and superfluous instructions for jury Questions 2 and 3 and did not proffer "proposed questions giving the jury the [other conservatorship] option[s]."

Question 1 of the trial court's charge to the jury asked: "Should the parental rights of mother[] . . . be terminated as to [C.A.J.]?" The jury answered: "Yes." The trial court's charge then asked the jury to "proceed to Question 2" and stated

69

that "the instructions and definitions on the following page" applied to both Questions 2 and 3 in the court's charge. After providing the jury with "Special Instructions and Definitions for Questions 2 and 3," Question 2 of the charge asked the jury: "Should [DFPS] be appointed Managing Conservator as to [C.A.J.]?" And Question 3 of the charge asked the jury: "Should [mother] be appointed Sole Managing Conservator as to [C.A.J.]?"

Mother's ineffective-assistance-of-counsel complaint on appeal relates to the "Special Instructions and Definitions for Questions 2 and 3," which she asserts were superfluous and irrelevant, as well as to her counsel's failure to proffer other jury questions on the issue of conservatorship beyond what was asked of the jury in Questions 2 and 3 of the trial court's charge. But, before even reaching the "Special Instructions and Definitions for Questions 2 and 3" or Questions 2 and 3 in the trial court's charge, the jury would have already answered Question 1 and found that mother's parental rights to C.A.J. should be terminated. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex. 1982) (we presume jury properly followed trial court's instructions).

In addition to showing that her trial counsel's performance was deficient, mother must show that there is a reasonable probability that, but for her counsel's deficient performance, the result of the proceeding would have been different. *See In re M.S.*, 115 S.W.3d at 549–50; *see also Medellin*, 2012 WL 4466511, at *5. In

70

other words, mother must demonstrate that if her trial counsel had objected to the purportedly irrelevant and superfluous instructions provided to the jury for Questions 2 and 3 and if her counsel would have proffered "proposed questions giving the jury [other conservatorship] option[s]," her parental rights to C.A.J. would not have been terminated. *See Medellin*, 2012 WL 4466511, at \*5 (father "must show that had his counsel objected to portions of [the witness's] testimony, and had that testimony been excluded, there is a reasonable probability that his parental rights would not have been terminated").

In a single sentence in her brief, mother states that her "defense was prejudiced by her counsel's failure to object and/or offer appropriate proffers." Texas Rules of Appellate Procedure require that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *See* TEX. R. APP. P. 38.1(i). Conclusory statements are not enough. *See In re G.P.*, No. 01-16-00346-CV, 2016 WL 6216192, at \*22 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.); *Izen v. Comm'n for Lawyer Discipline*, 322 S.W.3d 308, 321–22 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Sullivan v. Bickel & Brewer*, 943 S.W.2d 477, 486 (Tex. App.—Dallas 1995, writ denied) (points not supported by argument and authority waived). The failure to provide substantive analysis waives an issue on appeal. *See In re G.H., Jr.*, No. 12-16-00327-CV, 2017 WL 2464694, at \*4 (Tex. App.—Tyler June

71

7, 2017, pet. denied) (mem. op.); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994); *In re G.P.*, 2016 WL 6216192, at *22.

Mother does not provide the Court with any argument or analysis regarding whether there is a reasonable probability that, but for her trial counsel's purported deficient performance, the result of the proceeding would have been different, i.e., her parental rights to C.A.J. would not have been terminated. Instead, she summarily states that she was prejudiced. This is not sufficient. *See, e.g.*, *In re G.P.*, 2016 WL 6216192, at *22–23; *L.F.*, 2012 WL 1564547, at *12–14.

Still yet, even if mother's prejudice assertion had been properly briefed, she cannot not show that if her counsel had objected to the purportedly irrelevant and superfluous instructions provided to the jury for Questions 2 and 3 or if her counsel would have proffered "proposed questions giving the jury [other conservatorship] option[s]," her parental rights would not have been terminated. This is because the jury, in this case, found that mother's parental rights should be terminated before it even read the "Special Instructions and Definitions for Questions 2 and 3" or Questions 2 and 3 in the trial court's charge—the portions of the trial court's charge about which mother complains. And even if mother's trial counsel would have proffered "proposed questions giving the jury [other conservatorship] option[s]" than those provided for in Questions 2 and 3, such as mother being appointed as a possessory conservator of C.A.J. or the appointment of joint managing conservators

of C.A.J., those additional conservatorship questions would have only become relevant to the jury's deliberations if they did not find that mother's parental rights to C.A.J. should be terminated. Because mother cannot show that her trial counsel's purported deficient performance prejudiced her, we conclude that her ineffective-assistance-of-counsel complaint must fail. *See In re M.S.*, 115 S.W.3d at 549–50.

Finally, mother argues that her retained trial counsel did not provide her with effective assistance at trial because counsel did not object to the trial court's responses to questions from the jury.

During deliberations, the jury submitted a note to the trial court, which asked: "If Question 3 is answered no, what is the result? How will this affect [C.A.J.'s] conservatorship?" The trial court, without objection from mother's trial counsel, responded to the jury's note by stating: "[P]lease refer to the instructions given in the jury charge." The jury submitted another note to the trial court, which asked: "If Question 3 is answered no, will [C.A.J.] be placed in (joint managing conservatorship)? The trial court, without objection from mother's trial counsel, responded to this note by stating: "[T]he Court cannot advise you as to the effect of your answers. Please refer to the definitions in the jury charge."

Mother asserts that her trial counsel "should have objected to the[] [trial court's] responses, argued [that] the instructions and definitions were of no help to

73

the jury, that the [trial] court should [have] respond[ed] that only [m]other or DFPS would be considered for conservatorship, and that the instructions about possessory conservatorship, joint managing conservatorship, and placements with others were irrelevant to the jury's answers." (Emphasis omitted.)

As noted above, mother must show not only that her trial counsel's performance was deficient, but also that there is a reasonable probability that, but for her counsel's deficient performance, the result of the proceeding would have been different, i.e., her parental rights to C.A.J. would not have been terminated. *See In re M.S.*, 115 S.W.3d at 549–50; *see also Medellin*, 2012 WL 4466511, at *5. Again, we note that, in a single sentence in her brief, without analysis, mother states that her trial counsel's failure to object to the trial court's responses to the jury's notes "prejudiced [her] defense because it misled the jury." *See* TEX. R. APP. P. 38.1(i); *In re G.H., Jr.*, 2017 WL 2464694, at *4; *In re G.P.*, 2016 WL 6216192, at *22. This is not sufficient to assert mother's ineffective-assistance-of-counsel complaint on appeal.

Still yet, even if mother's prejudice assertion had been properly briefed, mother cannot show that had her trial counsel objected to the trial court's responses to the jury's questions her parental rights to C.A.J. would not have been terminated. This is because mother's complaint focuses on the trial court's responses to the jury's notes concerning Question 3. And before the jury ever reached Question 3 in

74

the trial court's charge, the jury responded "Yes" to Question 1, finding that mother's parental rights to C.AJ. should be terminated. Because mother cannot show that her trial counsel's purportedly deficient performance prejudiced her, we conclude that her ineffective-assistance-of-counsel complaint must fail.

We hold that mother's retained trial counsel did not provide her with ineffective assistance at trial.

We overrule mother's third issue.

**Exclusion of Evidence**

In her fourth issue, mother argues that the trial court erred in excluding certain evidence of "other viable conservatorship and/or kinship placement options" and of "DFPS not following the law and its own policies" because the trial court's error likely caused the rendition of an improper judgment.

We review the admission or exclusion of evidence for an abuse of discretion. *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *In re J.P.B.*, 180 S.W.3d at 575. An abuse of discretion occurs if the trial court acts unreasonably or arbitrarily, without reference to guiding principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Calderon v. Tex. Dep't of Family & Protective Servs.*, No. 03-09-00257-CV, 2010 WL 2330372, at *6 (Tex. App.— Austin June 11, 2010, no pet.) (mem. op.). We uphold a trial court's admission or exclusion of evidence unless (1) there was no legitimate basis for the court's ruling,

and (2) the error probably caused the rendition of an improper judgment. *Calderon*, 2010 WL 2330372, at \*6; *see also Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). If the substance of the excluded evidence was before the court in other testimony, there is no reversible error. *In re H.L.B.*, No. 01-12-01082-CV, 2013 WL 3866651, at \*8 (Tex. App.—Houston [1st Dist.] July 23, 2013, no pet.) (mem. op.); *Tex. Dep't of Transp. v. Able*, 981 S.W.2d 765, 770–71 (Tex. App.—Houston [1st Dist.] 1998), *aff'd*, 35 S.W.3d 608 (Tex. 2000).

Global complaints that the trial court committed harmful error by excluding certain evidence are insufficient to present an issue for appellate review. *See* TEX. R. APP. P. 38.1(i); *In re Estate of Curtis*, 465 S.W.3d 357, 379 (Tex. App.—Texarkana 2015, pet. dism'd). An appellate court is not required to search the appellate record to determine if the record supports the party's argument. *See Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 489–90 (Tex. App.—Fort Worth 2004, no pet.); *Wade v. Comm'n for Lawyer Discipline*, 961 S.W.2d 366, 373 (Tex. App.—Houston [1st Dist.] 1997, no writ) ("An appellate court is under no duty to make an independent search of the record for evidence supporting an appellant's position."); *see also In re B.T.D.*, No. 01-16-00582-CV, 2017 WL 343613, at \*7 (Tex. App.—Houston [1st Dist.] Jan. 20, 2017, no pet.) (mem. op.). Because a party bears the burden of showing that the record supports the contention raised, and of specifying the place in the record where matters upon which she relies

or of which she complains are shown, we focus on the portions of the record that mother directs this Court to in her opening brief.[68] *See* TEX. R. APP. P. 38.1; *Houghton v. Port Terminal R.R. Ass'n*, 999 S.W.2d 39, 51 (Tex. App.—Houston [14th Dist.] 1999, no writ).

First, mother appears to complain that the trial court erred in excluding certain testimony of mother's girlfriend, Amber. During Amber's testimony, she testified about a home study conducted related to her being a potential placement for C.A.J., and she stated that her home was recommended as an appropriate placement for the child. Mother's trial counsel asked Amber certain questions about the home study that was completed, such as "When th[e] home study was performed on you, did they do a background check?" and "What, if any, hits came up on you for a criminal history?" The trial court sustained objections to several of mother's counsel's questions to Amber about the home study's revelations, the home-study process, and the type of questions that Amber had been asked as part of the home study. Despite the trial court sustaining such objections, though, the trial court admitted a copy of

---

[68] Although mother refers to pages of the reporter's record in her brief, her citations lack specificity. *See Toldson v. Denton Indep. Sch. Dist.*, No. 02-18-00394-CV, 2019 WL 6205245, at *12–14 (Tex. App.—Fort Worth Nov. 21, 2019, no pet.) (mem. op.) (noting difficulties with imprecise citation to record and holding issue waived for inadequate briefing); *In re Caldwell-Bays*, No. 04-18-00980-CV, 2019 WL 1370316, at *8 (Tex. App.—San Antonio Mar. 27, 2019, orig. proceeding) (mem. op.) (noting party's citations to record were imprecise and identifying what court "believe[d] she [was] referring to").

the entire twenty-five-page home-study report completed on Amber in March or April 2019. *See In re H.L.B.*, 2013 WL 3866651, at \*8; *Able*, 981 S.W.2d at 770–71; *see also In re R.H.W. III*, 542 S.W.3d 724, 740 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("When evidence identical or similar to the objected-to evidence is admitted elsewhere without objection, there is no harm."); *Pyle v. S. Pac. Transp. Co.*, 774 S.W.2d 693, 696 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

Mother's trial counsel also asked Amber whether she had "made [herself] available to [DFPS] for permanent placement for [C.A.J.]?" And although the trial court sustained an objection to that question, this information is also available in the twenty-five-page home-study report, a copy of which the trial court admitted into evidence. Amber also testified about the steps she had taken to request that C.A.J. be placed with her. And DFPS caseworker Owens testified that DFPS looked at Amber as a potential placement, noting that a home study of Amber was completed by DFPS in March or April 2019. *See In re H.L.B.*, 2013 WL 3866651, at \*8; *Able*, 981 S.W.2d at 770–71; *see also In re R.H.W. III*, 542 S.W.3d at 740; *Pyle*, 774 S.W.2d at 696. Thus, we hold that the trial court did not commit reversible error in sustaining objections to certain complained-of portions of Amber's testimony.

Mother also appears to complain about a portion of the testimony of C.A.J.'s maternal grandmother during which mother's trial counsel sought to question the grandmother about having C.A.J. placed with her. The grandmother testified,

78

without objection, that although she and her husband, C.A.J.'s maternal grandfather, initially felt that they were too old to take care of C.A.J.—a very active child—she and her husband changed their minds and sought to have C.A.J. placed with them. And C.A.J.'s maternal grandmother spoke to caseworker Owens about having C.A.J. placed in her home. *See In re H.L.B.*, 2013 WL 3866651, at *8; *Able*, 981 S.W.2d at 770–71; *see also Pyle*, 774 S.W.2d at 696. We hold that the trial court did not commit reversible error in sustaining objections to certain complained-of portions of the maternal grandmother's testimony.[69]

Finally, mother asserts that the trial court erred in excluding the testimony of mother's expert witness, Cheryl Harvick, who was going to testify about DFPS's failure to "follow[] the law and its own policies" as well as the "statistics about adoption placements breaking down."[70]

Outside the presence of the jury, mother's trial counsel made an offer of proof and summarized what she believed Harvick would testify to at trial, stating:

> [I]f . . . Harvick were to testify, she would testify specifically to the investigation that was held in this case. I believe she has the expertise and the experience to give an opinion as to the investigation of [mother] and as to the allegations against her with [C.A.J.]. I believe

---

[69] To the extent that the trial court sustained objections to the aforementioned portions of Amber's testimony and the testimony of C.A.J.'s maternal grandmother, we note that no one requested that the testimony be stricken or that the trial court instruct the jury to disregard the complained-of portions of testimony. Thus, mother was still able to get before the jury the testimony that she complains was excluded.

[70] We need not address DFPS's assertion that mother did not preserve this complaint for appellate review. *See* TEX. R. APP. P. 47.1.

that her expertise and her knowledge, that she would be able to educate the jury on the policies, the procedure and the law as it relates to . . . DFPS as to what their policies and procedures are when it comes to investigation.

. . . I believe she would be able to testify that th[e] investigation report and those [DFPS] investigators that were involved in the investigation did not follow the policies and procedures of [DFPS], that they did not perform a proper investigation when it comes to the allegations made against [mother] as to how she may or may not have harmed [C.A.J.].

I believe that once she testified to the report pointing out all of the errors, mistakes, and the way that the caseworkers did not properly perform their duties, I think that that would be directly related to the credibility of those witnesses, specifically, Melissa Scott as well as her supervisor, Nisela [Zamorano] . . . . I believe it would go to those two witnesses['] credibility. Once that credibility would be attacked, I think they could also be impeached based on their report versus what they testified to.[71]

I think that . . . specifically relates to the issue here at trial because the jury will have a duty of finding a fault ground plus best interest. The fault ground can only come into effect in this case when [mother] had [C.A.J.] in her care, custody and control which happened before the removal in December 2018; therefore, the only way they can find a fault ground is based on the investigation. Specifically[,] in this case, it was that [C.A.J.] tested positive for cocaine.

The investigation shows that there were two drug tests . . . done at West Oaks . . . . [One test] came up positive for cocaine and then a repeat [test] two days later came up negative for cocaine. There was a removal based on those two . . . tests as well as [mother] admitting to participating in using cocaine; however, when asked if she would have any idea how cocaine may have gotten in [C.A.J.'s] system, she

---

71     We note that mother called Scott to testify at trial and Scott did not testify about the contents of her CPS Investigation Report, making impeachment "based on [her] report versus what [she] testified to" at trial improbable. Mother does not complain about any portions of Scott's testimony being excluded.

repeatedly denied having any knowledge of how that would have happened.

In addition, the investigation shows that there were no collaterals interviewed. There were no teachers, no doctors, no neighbors, no relative, nobody was interviewed properly to see whether these allegations could be confirmed or not. The removal happened . . . in January, but the removal happened before there was an additional drug test that came back where [DFPS] had requested a hair follicle on [C.A.J.]. That hair follicle came back positive for cocaine above 20,000 picograms. Based on the investigation and the testimony, there [was] no investigation as to how that cocaine in [C.A.J.'s] hair, if at all, how it got there. There's not even any testimony as to whether he suffered any effects from having cocaine at that level in his hair, whether it caused him injury, whether it's caused him any kind of developmental delay or any physical injury as to a level of cocaine in his body if it is even true. And I don't believe that, based on the investigation being done improperly, that that would give the jury enough information to find a fault ground without the testimony of . . . Harvick.

The only way they would know that the policies and procedures had been violated, the only way they would know that the investigation was not done properly, would be through the testimony [of] . . . Harvick, through her expertise. Because when asked those questions, the caseworkers on the stand . . . said they either didn't know what the policy was, they didn't recall what the policy was or they didn't recall what had or had not happened within the investigation. And so[,] without that [the] expert testimony of . . . Harvick, the jury would be unable to determine the credibility of the witnesses, the investigators . . . as well as the proper procedure done on the investigation.

Another issue . . . that will be before the jury[] . . . is whether [DFPS] should get [permanent managing conservatorship of C.A.J.] and [mother] terminated and whether [C.A.J.] should ultimately be placed for adoption. We're talking about a child who is seven years old now with a minimum of four mental health diagnos[es] who has experienced trauma since in care, not in his mother's care, but since in care. He has been removed from seven -- six different

placements. . . . And the therapist has testified about his behavioral problems.

. . . .

. . . Harvick, in her testimony as a master investigator, has had to remove many children, whether they were placed for adoption or just in long-term placement based on their behavior. She would be able to testify to the amount of homes that -- placements that break down because of the child's behavioral issues. She would be able to testify, at least in her experience, the number of adoptive homes that have broke[n] down or the adoptive parents have returned the child to [DFPS] based on their behaviors where she has had to pick those children up. That's an issue that is directly related to [C.A.J.] and the best interest in this case.

Any error by the trial court in excluding the testimony of Harvick is reversible only if mother can show that the error was harmful, meaning that it probably caused the rendition of an improper judgment. *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 551–52 (Tex. 2018); *Interstate Northborough*, 66 S.W.3d at 220; *see* TEX. R. APP. P. 44.1. In determining whether the erroneous admission of evidence was harmful, we review the entire record. *Interstate Northborough*, 66 S.W.3d at 220; *Sundance Energy, Inc. v. NRP Oil & Gas LLP*, No. 01-18-00340-CV, 2019 WL 3819523, at *7 (Tex. App.—Houston [1st Dist.] Aug. 15, 2019, pet. denied) (mem. op.). "Typically, a successful challenge to a trial court's evidentiary ruling[] requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Interstate Northborough*, 66 S.W.3d at 220; *see also In re N.F.*, No. 09-19-00435-CV, 2020 WL 2070286, at *20 (Tex.

App.—Beaumont Apr. 30, 2020, pet. denied) (mem. op.) ("Evidentiary rulings do not usually cause reversible error unless an appellant can demonstrate that the judgment turns on the particular evidence that was admitted or excluded.").

The judgment in a termination-of-parental-rights case necessarily rests on all of the evidence by which the fact finder determines whether the parent has committed one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and whether termination of parental rights to a child is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b); *Boyd*, 727 S.W.2d at 533; *see also In re B.K.G.D.*, No. 01-20-00057-CV, 2020 WL 3821086, at *16 (Tex. App.—Houston [1st Dist.] July 2, 2020, no pet.) (mem. op.). In her brief, mother does not assert that the judgment turns on Harvick's excluded testimony, *see* TEX. R. APP. P. 38.1, and a review of the entire record does not show that the judgment terminating mother's parental rights turned on the testimony of Harvick. *See In re B.K.G.D.*, 2020 WL 3821086, at *16. Mother's assertion in her offer of proof that the only way that DFPS could establish that mother committed one or more of the acts or omissions enumerated in section 161.001(b)(1) would be "based on [DFPS's improper] investigation," specifically, that C.A.J. "tested positive for cocaine," is incorrect. We also note that mother has not challenged on appeal the sufficiency of the evidence to establish that she committed one or more of the acts or omissions enumerated in section 161.001(b)(1).

Because mother has not shown that the judgment terminating her parental rights turned on Harvick's excluded testimony, we hold that the trial court did not commit reversible error in excluding the testimony of mother's witness, Harvick. *See In re B.K.G.D.*, 2020 WL 3821086, at *16.

We overrule mother's fourth issue.

## Judgment

In her sixth issue, mother argues that the trial court erred in entering its judgment because the trial court's judgment does not conform to the jury's verdict in that the judgment contains certain inapplicable or irrelevant language and "reads as though [it] follow[ed] a bench trial, rather than a jury[] trial."

To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion and the trial court either ruled on the party's request, objection, or motion, or refused to rule, and the party objected to that refusal. TEX. R. APP. P. 33.1(a); *see also Ortiz v. Collins*, 203 S.W.3d 414, 427 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (to preserve complaint for appellate review, party must first present issue to trial court). A motion for new trial or a motion to modify, correct, or reform a judgment is an appropriate method of preserving error regarding an alleged defect in the trial court's final judgment. *See Ortiz*, 203 S.W.3d at 427; *Holland v. Hayden*, 901 S.W.2d 763,

765 & n.5 (Tex. App.—Houston [14th Dist.] 1995, writ denied); *see also Luna v. S. Pac. Transp. Co.*, 724 S.W.2d 383, 384 (Tex. 1987).

Here, mother did not file a motion for new trial or a motion to modify, correct, or reform a judgment to bring to the trial court's attention the purported errors in its judgment. *See* TEX. R. CIV. P. 329b. Because mother did not raise her complaint about the trial court's judgment below, we hold that she has not preserved her complaint for appellate review.[72] *See Sheets v. Autogroup Premier, Inc.*, No. 14-18-00279-CV, 2020 WL 548366, at *4 n.6 (Tex. App.—Houston [14th Dist.] Feb. 4, 2020, no pet.) (mem. op.) (party's responsibility to challenge contents of signed final judgment via motion for new trial or motion to alter, modify, or correct judgment); *see also* TEX. R. APP. P. 33.1; *Valdez v. Valdez*, 930 S.W.2d 725, 728 (Tex. App.—Houston [1st Dist.] 1996, no writ) (because party never complained to the trial court, he never gave trial court opportunity to correct alleged error).

### Remand

In her fifth issue, mother argues that this Court should remand her case to the trial court in the interest of justice because the cumulative effect of the trial court's errors necessitates a new trial.

---

[72] To the extent that mother appears to incorporate a sufficiency-of-the-evidence complaint in her sixth issue, we hold that she has not preserved it for appellate review. *See* TEX. R. APP. P. 33.1(d); *In re S.G.*, 2019 WL 1448870, at *4.

Multiple errors, even if considered harmless when taken separately, may in some instances result in reversal and remand if the cumulative effect of such error is harmful. *Jones v. Lurie*, 32 S.W.3d 737, 745 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 570 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998). But before we may reverse a judgment and order a new trial, we must determine that the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Weidner v. Sanchez*, 14 S.W.3d 353, 377–78 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Malone*, 916 S.W.2d at 570; *see* TEX. R. APP. P. 44.1.

Here, mother must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to her. *Weidner*, 14 S.W.3d at 377–78; *Malone*, 916 S.W.2d at 570. Significantly, mother has not directed this Court to any authority holding that the trial court's non-errors may, in their cumulative effect, require reversal and a new trial. *See In re Commitment of Sells*, No. 09-15-00172-CV, 2016 WL 1469059, at *12 (Tex. App.—Beaumont Apr. 14, 2016, pet. denied) (mem. op.); *see also Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

In light of our previous analysis related to mother's other issues and based on the entire record, we hold that mother has failed to show that but for the cumulative

effect of the trial court's errors, if any, the jury would have rendered a verdict favorable to her.[73] *See Fisher v. Kawasaki Heavy Indus., Ltd.*, No. 13-15-00364-CV, 2017 WL 2817662, at *8 (Tex. App.—Corpus Christi–Edinburg June 29, 2017, no pet.) (mem. op.) (overruling appellant's cumulative-error argument in light of court's disposition of appellant's other issues); *Gainsco Cty. Mut. Ins. Co. v. Martinez*, 27 S.W.3d 97, 107 (Tex. App.—San Antonio 2000, pet. dism'd by agr.).

We overrule mother's fifth issue.

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Justices Kelly, Goodman, and Countiss.

---

[73] The authorities cited by mother in her brief are inapplicable.